UNITED STATES, Appellee

v

RAYMOND G. ROGERS, Private, U. S. Marine Corps, Appellant

14 USCMA 570, 34 CMR 350

No. 17,274

June 5, 1964

*Lieutenant Colonel John R. DeBarr*, USMC, argued the cause for Appellant, Accused.

*Major J. M. Detrio*, USMCR, argued the cause for Appellee, United States. With him on the brief was *Captain James A. Potter*, USN.

## Opinion of the Court

QUINN, *Chief Judge:*

The accused was tried by a general court-martial convened at Camp Hauge, Okinawa, for premeditated murder of a fellow Marine, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. He was convicted of unpremeditated murder and sentenced to a dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for fifteen years. The conviction was approved by the convening authority, but modified by a board of review. Although the accused objected at trial to an instruction on involuntary manslaughter because it was inconsistent with his defense, the board of review concluded the evidence was sufficient only to show the homicide was caused by culpable negligence. It, therefore, affirmed only findings of guilty of involuntary manslaughter, in violation of Article 119 of the Uniform Code, 10 USC § 919, and reduced the period of confinement to three years. We granted further review to consider the correctness of the board of review's decision and its denial of a separate petition for a new trial.

About 7:10 a.m. on November 13, 1961, the body of Corporal Stroman L. Ford was found on Kin Beach, Okinawa. Ford was dead. His body was on its back, with the head on the beach and the feet in the ocean; the water came to about the beltline. The body was clothed in a white T-shirt, black trousers, and sneakers. Rigor mortis was "[f]airly extensive." There was a large bruise that measured 8 x 7 centimeters in the left parietal area of the skull; in an "adjacent" area there was a small cut about 2 centimeters long. Contusions were about the right eye and bridge of the nose; there was a small cut on the left temple, and one in front of the left ear. An autopsy performed that afternoon indicated the "cause of death was drowning with the immediate cause . . . being pulmonary edema [accumulation of fluids in the lungs]."

An examination of the beach area led to the discovery of human bloodstains on a low coral rock formation about fifteen yards from Ford's body. "[D]rag marks" on the beach, which started at the base of a raised grassy bank in the rear of Ford's barracks, trailed across the coral rock outcropping to the place where the bloodstains were found. Five days later, the accused gave Criminal Investigator Andrew N. Thomson a statement. Among other things, the accused admitted that on the night of November 12 he and Private William A. Bauer had a fight with Ford in the area in back of the barracks. While "not sure," the accused thought Ford was rendered unconscious. He and Bauer then "picked him up and carried him down" to the coral rocks. They "put his head under the water" a couple of times and then "pushed . . . [him] into the water." Bauer "said he thought . . . [Ford] was dead." He and the accused returned to the barracks. If this was all the evidence, the record of trial would not merely support the reduced findings of the board of review, but indicate that those findings were generous to the accused. To submerge a person known to be unconscious several times in the ocean, and then push him into the water, would readily support the inference of an intent to effect his death. However, there is other evidence in the case which, the accused says, shows Ford was "alive . . . subsequent to his affray with the accused."

One of the circumstances emphasized by defense counsel at trial to show the accused's fight with Ford was unrelated to his death, and a matter which gave the board of review some concern, was the large wound on Ford's head. According to the medical evidence, the wound was probably caused either by a

fall or by a blow with a "blunt instrument"; if an instrument was used blood would "probably" adhere to it after the blow. The wound was probably received before death because it would not otherwise have matted with the sand as it did. According to Dr. Stewart A. Chamblin, Jr., who performed the autopsy, the injury would "likely" produce unconsciousness. The accused testified he used no weapon or club in the fight with Ford; and he maintained neither he nor Bauer "bang[ed]" Ford's head against the coral. He denied that either he or Bauer hit Ford with anything but his fists. The evidence provides a firm basis upon which the triers of the facts could reject these denials and conclude the accused was connected with the injury.

The accused admitted that in the course of the fight with Ford, Bauer took out a knife. The accused said he grabbed the knife from Bauer before it was used. However, he did not produce the knife. He did not attempt to explain that it was no longer available to him at trial; and he did not describe the knife as being either so small or so light as to be incapable of inflicting the wound. The omissions are significant in light of the medical testimony that sand was "matted in the blood" in the wound area, and that this condition could occur only if the wound was inflicted before Ford died. The accused admitted that when he took the knife from Bauer, he "got down beside" Ford and grabbed an arm that "Bauer . . . [had been] holding down." He also admitted he threw "[m]aybe two fists fulls" of sand at Ford. Ford said: "Go ahead kill me." "[A]ll of a sudden," Ford "just stopped" fighting and "laid there." In one of his pretrial statements, the accused described what happened next, as follows:

"Q. After throwing the dirt in Fords face what did you do?
"A. We picked him up and carried him down to the water and layed him on the coral. Then Bauer dunked his head under the water and pulled it out again. He did this twice I think. I'm not sure but I think I slided Cpl Fords legs around at this

time. Then we pushed Cpl Ford into the water.

"Q. After pushing Cpl Ford into the water, what did you do.
"A. We went back up beside the barracks.

"Q. After throwing Ford into the water did you believe him to be dead?
"A. No! I didn't think he was dead. Bauer said he thought he was dead but he kept looking around to make sure Cpl Ford wasn't sneaking up behind us."

At trial, the accused changed his story. He testified that he and Bauer carried Ford's body to the coral rocks, and Bauer merely "put . . . [Ford's] head underneath the spray" from the incoming waves that broke about twenty feet away. He also insisted Ford was left on the coral rocks, not pushed into the ocean. This testimony, of course, was not conclusive of the issue. The triers of fact were free to reject the trial version of the disposal of Ford's body, and credit the accused's pretrial account of what happened in the fight on the beach. They could reasonably infer that the knife was used as a bludgeon and caused the wound; that sand "matted" with the blood when the accused threw sand at Ford; and that the sand did not wash out when Ford's head was held under water by Bauer. The inference is strengthened by the accused's failure to produce, or account for, the knife. See Dyson v United States, 283 F2d 636 (CA 9th Cir) (1960), cert den 366 US 974, 6 L ed 2d 1264, 81 S Ct 1944 (1961); Elwert v United States, 231 F2d 928 (CA 9th Cir) (1956). We are not suggesting that this is the only basis upon which to account for Ford's head wound. There is evidence of other drag marks, leading from a log at the water's edge to about the same place on the beach just below the grass embankment from which Ford and the accused fell, which join the drag marks leading from the coral on which the bloodstains were found. It is reasonably inferable that in the course of the fight on the beach Ford hit his head on

the log and was rendered unconscious; and that the accused and Bauer thereafter attempted to make it appear that Ford was injured on the coral rocks. In the post-trial review, the staff legal officer presented several other possibilities that find support in the evidence. What we say here is merely that there is ample justification in the evidence to connect the accused with a large wound in Ford's head. See United States v Hurt, 9 USCMA 735, 788, 27 CMR 3.

In concluding that the accused did not entertain a deliberate intent to kill Ford, the board of review obviously gave more weight, than did the court-martial, to some of the accused's trial testimony. Its opinion indicates an unwillingness to draw the inference that Ford's head wound was deliberately inflicted by the accused. However, the board of review's doubt as to the precise manner in which the wound was sustained does not undermine the validity of its findings that the accused's conduct brought about Ford's death. Cf. United States v Whitley, 3 USCMA 639, 645, 14 CMR 57.

Other items of evidence are selected by the accused to show that at least a reasonable doubt exists as to whether his fight with Ford was connected with Ford's death. He points to the "fact" that Ford's body was found on the beach about ten to fifteen yards from the coral rock on which Ford was "left lying." The board of review's opinion does not support the accused's conclusion that it determined Ford was actually left on the coral.[1] But whether Ford was "pushed" into the water, as the accused admitted in his pretrial statement, or whether he was left on the coral, as the accused testified at trial, is immaterial. If Ford was placed in the water while in an unconscious condition, gross negligence is manifest. Similarly, if Ford was left on the coral, his condition and his close proximity to the ocean provided the board of review with a reasonable basis upon which to conclude there was more than a foreseeable likelihood that Ford might stumble into the water and drown.

The accused also attaches a great deal of importance to testimony by Private First Class Charles H. Williams that he saw Ford in the barracks sometime between 12:30 and 3:30 a.m. on November 13. According to Williams, Ford was then wearing "a dark blue shirt and a skivvy shirt under it."[2] Pointing to his own testimony that the fight with Ford took place before 11:00 p.m. on November 12, and that Ford's body when found was clothed in a white T-shirt not a blue shirt, the accused contends that Ford must have been alive and well long after he and Bauer left him on the beach. However, Williams' estimate of the time he saw Ford is entirely consistent with the other evidence, and does not cast doubt upon the validity of the finding that the accused's actions directly resulted in Ford's death.

Williams testified he saw Ford in the barracks "head." He placed the time as between 12:30 a.m. and 3:30 a.m. Yet, Williams had no watch. He said he estimated the time as follows:

". . . I figured I went to hit the pad about 10:30 and I'd say it took me at least a half hour to sleep. So, I did sleep sometime so I just figured 12:30 to 3:30, because when I figured I hit the rack again there was a period of time before reville [sic] went."

Williams further testified he "normally" made a "head" call during the night at about two o'clock. In reply to defense

---

[1] In reviewing the evidence, the board of review said the accused and Bauer "left . . . [Ford] *either on the beach or in the water* apparently in an unconscious condition"; and in stating its findings, it said, "we . . . find culpable negligence . . . in . . . leaving . . . [Ford] in a helpless condition *at the edge of the shore* exposed to the tide." [Emphasis supplied.]

[2] The accused testified that Ford was wearing a "light colored sport shirt." Another witness, who testified for the defense, said he "believe[d]" that in an earlier fight between the accused and Ford, Ford was wearing "a light shirt."

576

counsel's question whether he "just as likely" saw Ford about two o'clock, as about twelve or twelve-thirty, he said, "I couldn't say that." Other evidence indicates that Williams' estimate of the time is consistent with the times of the two fights the accused had with Ford. It also provides a reasonable explanation for the change in Ford's attire, if there really was one, between the time Williams saw him and the second fight with the accused.

Corporals Lowell E. Helms and Grant E. Keys testified that while on a roving patrol on the night of November 12, they found Ford and the accused engaged in a "scuffle" in front of the barracks. They separated the two. The accused, who appeared to be sober, was told to leave. Ford appeared to be drunk, and insisted he "wanted to talk" to the accused. Keys talked to him a "few minutes"; Ford then went into the barracks through the front entrance. The members of the patrol walked to the side entrance, and Lance Corporal Thomas J. Graham entered the barracks to check on Ford. He came out, and reported that Ford was "not in the rack." At trial the accused placed the time of the fight as "somewhere around 10 o'clock . . . or a little after." He said the second fight in back of the barracks was "about 10:30 or 11:00, right in there." However, Keys testified that the scuffle in front of the barracks took place between eleven and twelve o'clock. Allowing for the time lapse between Ford's entry into the barracks and Graham's report that he was not in his bed, the finders of fact could conclude that Williams' estimate of the time he saw Ford was mistaken. They could find that Williams saw Ford after the first fight, not after the second. Reconciliation of the time of the two fights also provides a reasonable explanation for the change in Ford's clothing, if any. After he left Williams, Ford could have removed his top shirt and departed from the barracks wearing only the skivvy shirt, which Williams also saw. We hold, therefore, that these items of evidence do not cast doubt upon the sufficiency of the findings of guilty. We are satisfied the record of trial contains substantial evidence to support the findings of guilty approved by the board of review.

Although the evidence furnishes a logical explanation for Ford's attire when discovered on the beach, and negates the accused's contention that Ford was alive and well after the second fight, the accused contends he was prejudiced by "apparently perjured testimony" concerning Ford's clothing. The charge is repeated in the petition for new trial.

Staff Sergeant Floyd L. Stutts, one of the criminal investigators who worked on the case, was called as a defense witness. His examination was apparently designed to advance the defense theory that Ford met his death by means other than those connected with the accused. Under defense counsel's questioning, he testified that no wallet was found among Ford's effects; and that a person, whom the accused said had been standing on a seawall near the place where he and Bauer fought with Ford, could not be located. Stutts also acknowledged he searched for barbiturate drugs[3] and found some pills in a pillow case on Ford's bunk. Stutts' direct examination continued in material part as follows:

"Q. When you were checking FORD's personal effects did you find a blue sport shirt?
"A. No, sir, I did not.

"Q. As far as you know the shirt has never been found?
"A. No as far——

. . . . . .

"Q. Did you find a blue shirt in FORD's personal effects?
"A. No, sir."

The accused says Stutts lied when he testified he did not find a blue shirt among Ford's personal effects. To support this contention, he has submitted an affidavit from Corporal Keys to the effect that he saw Sergeant Stutts and another investigator examine Ford's wall locker and "pick out of . . . [the] locker and check closely a light

---

[3] At Ford's autopsy it was determined that his blood had a very high barbiturate level.

colored, blue, sport shirt." When the charge was presented to the board of review, the Government alleged the evidence was not newly discovered. In this Court, it submitted an affidavit from Corporal Keys in which he acknowledges that he told defense counsel of Stutts' examination of the wall locker, either during the accused's trial or at Bauer's subsequent court-martial. On oral argument before this Court, appellate defense counsel represented the information was not discovered during this accused's trial.

Assuming for the purpose of this appeal that the evidence is newly discovered, and assuming ■■■■■■ without deciding that it sufficiently appears Stutts was not merely mistaken in his testimony, knowledge of the presence of a blue shirt in Ford's locker would not add "materially to the evidence presented at trial." United States v Hodges, 14 USCMA 23, 31; 33 CMR 235. The color of Ford's shirt at the time Williams saw him had no significance to the defense theory that Ford was still alive and well after the second fight, aside from the *time* Williams saw Ford. In their brief appellate defense counsel, one of whom represented the accused at trial, admit the time of death "was the very element from which . . . [the accused] could be either found guilty or acquitted." If the triers of fact concluded that Williams saw Ford between the two fights, and not after the second as contended by the defense, discovery of the shirt in Ford's locker offered no advantage to the defense theory. If anything, it tended to support the prosecution's theory that Ford removed the shirt after he saw Williams. On the other hand, if the triers of fact determined that Williams really saw Ford as late as 2:00 a.m. or 3:00 a.m., that fact alone would require acquittal of the murder charge. What was important to the defense theory was the evidence that Ford was alive and well after the second fight. The finding of a blue shirt in his locker contributed nothing to that issue. Both the court-martial and the board of review found that Williams was mistaken in his estimate

of the time. There is ample evidence to support that finding; and Stutts' testimony denying he saw a blue shirt in Ford's locker does not detract from its validity. We conclude that nothing in the claim of perjured testimony justifies reversal of the conviction. See United States v Hodges, supra, at page 31.

From what we have said, it is apparent that, next to the accused, Williams was probably the most important witness for the defense. Williams was called initially as a Government witness to testify to the discovery of Ford's body. Over trial counsel's objection that the cross-examination was exceeding the scope of the direct, defense counsel was permitted to question Williams about his meeting with Ford in the barracks washroom between 12:30 a.m. and 3:30 a.m. Defense counsel was also allowed to elicit testimony to the effect that for the past fifteen months Williams "normally" made a "head" call at about 2:00 a.m.; and that previous to the trial, Williams gave Criminal Investigations Detachment agents a statement in which he fixed the time as between 2:30 a.m. and 3:30 a.m. Williams further testified he had known Ford for about sixteen months and had become "pretty good friends" with him. On redirect examination, trial counsel questioned Williams about his estimate of the time. The most material part of the examination was quoted earlier in this opinion. The court also subjected Williams to some questioning. Later Williams was called as a defense witness. On direct examination he repeated his earlier testimony about seeing Ford in the barracks. In the cross-examination, he said Ford was a "little drunk"; he noticed no marks or bruises on him, and he "couldn't tell" if Ford's clothing was wet or sandy. The defense then rested its case. After Agent Thomson was called as a rebuttal Government witness and testified briefly, the Government also rested. Counsel indicated they had nothing further to present and the law officer asked the court whether it desired to have any witness called or recalled. A note was passed

to him by the court. It reads as follows:

"From:
　　Rogers testimony—
　　　　Ford left on coral at about 2300
　　Williams testimony—
　　　　Last saw Ford in head about 1230–0330

"Therefore:
　　Suggest further interrogation of *Williams* to determine:
　　1. Whether, in fact, it was Ford he saw in head.
　　2. If so, the time of the meeting more accurately."

It is reasonably inferable from the record of trial that the note was shown to defense counsel. The law officer's response to the note was as follows:

"LO: The difference in the testimony—where there are discrepancies in testimony of two witnesses, is something this court will have to,—be resolved by the court. As far as my ruling on this—it would appear that counsel has pretty well exhausted the testimony of each witness. This note will also be marked as an Appellate Exhibit and appended to the record. Are there any questions or witnesses?

"PRES: No.

"LO: At this time, it appears that all the testimony is in. . . . I want you to have the arguments and instructions immediately following the arguments and then the meeting of the court for deliberation. It is not going to be possible to do all this this afternoon. Therefore, I would suggest that we meet as soon as every one can be here in the morning—adjourn until in the morning."

Before court convened the next morning, the law officer held an out-of-court hearing to consider the instructions. At this hearing, defense counsel referred to the court's note and the law officer's comments on it. He argued there was no actual difference between the testimony of Williams and that of the accused. He submitted the following instruction to "clarify the matter":

"On our last closing, a question, marked as App Ex VII was handed to the LO by one of the members of the court. [T]he question concerned the testimony of two witnesses. My comment to the court was that counsel had apparently exhausted that area of the testimony and that the court must resolve the difference in the testimony themselves. You are to disregard my remarks that there was *a difference in the testimony* because there is no difference or conflict between the testimony of these 2 witnesses. If the court member desires that that witness be recalled, he may so inform the court."

The law officer approved part of the requested instruction. He substituted for the phrase "because there is no difference or conflict between the testimony of these 2 witnesses," the statement that "[i]t is your prerogative to determine if there is a difference and if so to resolve that in your deliberations"; and he omitted the last sentence about recall of "that witness." Defense counsel objected to the proposed modification because it emphasized a "difference of testimony," which he believed did not exist. However, he did not object to the elimination of the last sentence of the requested instruction; nor did he ask to reopen the defense case for further examination of either the accused or Williams, or that Williams be recalled as a court witness. See Manual for Courts-Martial, United States, 1951, paragraph 149*a*. When court convened, the law officer referred to the note, and gave the court the modified instruction discussed in the out-of-court hearing. The accused now contends the law officer, in effect, denied a court request to recall Williams, and that the denial was prejudicial to him because of the importance of Williams' testimony to the theory of defense.

Military practice does not require a court-martial to "content itself with the evidence adduced by the parties." Manual for Courts-Martial, supra, paragraph 54*b*. After the parties have rested, the court may ask that witnesses other than those who testified be called; and it may require that a witness who testified be recalled for

additional examination. The Manual's Guide—Trial Procedure notes that, except as to a witness expected to testify to the accused's sanity, the law officer "will rule finally as to whether the witness will be called." Manual for Courts-Martial, supra, Appendix 8a, at page 517. The Government contends the Guide's statement of the law officer's authority comports with the discretionary right of a civilian judge to allow or to reject a juror's request to recall a witness or to reread his testimony. See 89 CJS, Trial, § 479; 98 CJS, Witnesses, § 351. Oppositely, the accused suggests the law officer has no discretion in the matter and must accede to a court member's request to recall a witness. He relies upon the statement in the principal opinion in United States v Parker, 7 USCMA 182, 186, 21 CMR 308, that "a court-martial has the unrestricted right to call for further witnesses, subject only to the law officer's determination of admissibility."

The *Parker* case did not contemplate a conflict between the right of the court-martial to recall a ▌ witness and the right of the law officer to rule, in his sound discretion, upon the necessity for further examination of the witness, *i.e.*, the admissibility of the testimony. The question before the Court was whether the board of review was correct in holding the law officer erred in permitting the introduction of additional evidence pursuant to the request of the court-martial, after it had deliberated for a time on the findings. Relying upon Federal and State cases recognizing the power of the trial judge to grant or deny, in his discretion, a request for additional evidence which is made by the jury after it has begun its deliberations on the merits, this Court reversed the decision of the board of review. The opinion in the case recognizes, rather than denies, coexistence of the right of the court-martial to request recall of a witness and the right of the law officer to rule on the request. The statement relied upon by the accused is specifically qualified, as follows:

"Turning now to civilian sources, it is well-established that a jury may reopen and request portions of the record reread, and it is discretionary with the trial judge as to what parts of the record will be restated. United States v Campbell, 138 F Supp 344 (ND Iowa) (1956); United States v Rosenberg, 195 F2d 583, 598–599 (CA 2d Cir) (1952), cert den 1952, 344 US 838, 73 S Ct 20, 97 L ed 652, rehearing denied 1952, 344 US 889, 73 S Ct 134, 97 L ed 687; Phillips v Carlson, 178 Kan 206, 284 P2d 604; Autry v State, 34 Ala App 225, 38 So 2d 348. Cases dealing with a request for additional evidence after the court has retired to deliberate on the findings are less numerous; however, a majority of the appellate courts which have considered the problem have held that such a request is predicated upon the discretion of the trial judge.

. . . . . .

"In view of the authorities above announced, we are of the opinion that it is discretionary as to whether or not the court will order further evidence to be introduced after it has retired to deliberate on the findings. In reaching this determination we have not overlooked the provision in the procedural guide of the Manual (page 517) that the law officer 'will rule finally as to whether the witness will be called.' Nor do we ignore Article 51(b) of the Code that makes interlocutory rulings by the law officer final. In construing these two provisions, together with the procedure authorized in paragraph 54b of the Manual, we hold that a court-martial has the unrestricted right to call for further witnesses, subject only to the law officer's determination of admissibility." [United States v Parker, 7 USCMA 182, 185, 186, 21 CMR 308.]

Turning to the court-martial's note, it is, as the Government contends, questionable whether there was ▌ a request to recall Williams, and a definite ruling by the law officer denying the request. But assuming the statement constituted a request to recall Williams, we cannot ignore its content. It was not a request for recall of either Williams or

the accused for further general examination, but a strictly limited request which specifically stated the area of inquiry and the precise questions to be determined. As so limited, we cannot say the law officer abused his discretion in denying the request on the ground that the proposed points of additional examination had already been covered exhaustively in the previous examinations.

A trial judge is vested with substantial discretion to regulate the order, the manner, and the scope ▮▮▮▮▮▮▮ of examination of the witnesses. See Manual for Courts-Martial, supra, paragraph 149; United States v Blankenship, 7 USCMA 328, 22 CMR 118. Williams was the first witness for the prosecution and the last witness for the defense. He told and retold the story of his encounter with Ford in the "head." He estimated and re-estimated the time of this encounter. The court had heard Williams on two separate occasions. It had two separate opportunities to weigh the accuracy of his estimate of the time. What additional purpose could be served by going over the ground once more? Had defense counsel or trial counsel attempted to retrace what Williams had already stated and re-stated, the law officer could properly require discontinuance of the question. See Fitzgerald v United States, 324 F2d 153 (CA 5th Cir) (1963); People v Gonzales, 217 Advance Cal App 2d 67, 31 West's Cal Rptr 540 (1963). We see no reason to deprive the law officer of the right to regulate the examination of a witness because the line of impermissible inquiry is pursued by a court member. See United States v Witt, 215 F2d 580, 584 (CA 2d Cir) (1954), cert den 348 US 887, 99 L ed 697, 75 S Ct 207 (1954). We hold, therefore, that assuming the law officer ruled against the recall of Williams, he did not abuse his discretion. See People v Reilly, 49 App Div 218, 63 NYS 18 (1900); People v Gonzales, supra; Fitzgerald v United States, supra.

Appellant next contends the law officer erred in instructing the court-martial as to its right to determine the voluntariness of the ▮▮▮▮▮ pretrial statement of November 18, in which he admitted Ford was "pushed" into the ocean. The Government contends no objection to the admission of the statement for lack of voluntariness was actually interposed in open court. The procedure followed by defense counsel was unusual. He twice told the law officer he had "no objection," other than those made in an out-of-court hearing on the matter, which, of course, raised no issue for the court-martial's consideration. See United States v Dicario, 8 USCMA 353, 360, 24 CMR 163. However, he also requested the right to "reserve . . . presentation of evidence on" the matter until the defense case-in-chief. The law officer did not rule on the request. As the case progressed, we think the law officer and counsel for both parties understood an objection was intended and, in fact, was made. We turn, therefore, to the evidence and the instruction.

Three written statements were obtained from the accused. The first was dated November 13 (Prosecution Exhibit 14); the second was obtained on November 14 (Prosecution Exhibit 15); and the third was made by the accused on November 18 (Prosecution Exhibit 13). The first two statements were admitted into evidence without objection by the defense. The failure to object to them was consistent with defense counsel's opening argument to the court-martial that the defense wanted it to "receive all the evidence that is available" and the defense was "not going to object to the government's presentation of evidence," but would do "everything" to assist the prosecution in that endeavor because the accused did not kill Ford. In the argument on this appeal, however, it is implied that some of the circumstances surrounding the November 14 statement tainted the statement of November 18.

Investigator Thomson testified that on November 18, while at the Naval Intelligence Office at Naha, he was informed by another agent that the accused "wanted to tell . . . [him]

something." He went to the room in which the accused was. As he had several times in the past, he informed the accused of his rights under Article 31, and advised him he was a suspect in the investigation into Ford's death. The accused appeared "composed." Without threat, coercion, or promise of reward of immunity or benefit, the accused made an oral statement. Then he wrote out one by hand. Before the written statement was admitted into evidence, defense counsel cross-examined Thomson. The examination was directed at the contents of the statement, rather than the circumstances of it execution. So far as Thomson's testimony is concerned, ▆▆▆▆▆ therefore, the voluntariness of the accused's November 18 statement was fully established at the time it was offered and admitted into evidence. Later, however, the accused testified, and Thomson was recalled as a rebuttal prosecution witness. Their testimony contains additional references to the various statements.

The accused was first interrogated in the office of his own Company on the afternoon of November 13. He submitted a written statement in which he said he last saw Ford at 10:30 p.m. on November 12. It was admitted, without defense objection, as a prior inconsistent statement. Little was said about the execution of this statement. Some of Thomson's testimony and preliminary recitals in the statement itself indicate it was entirely voluntary. In any event, there is nothing here that relates to, or affects, the execution of the November 18 statement.

On November 14, the accused made another statement. Agent Thomson testified the accused sought him out, and asked to talk to him away from the office. Thomson obtained a car, and drove outside the camp. While Thomson was still driving the car, the accused told him to stop; he had " 'something' " to tell him and did not want him to " 'have an accident.' " Thomson complied. The accused then said, " 'I think I'm the man who killed Ford.' " Advised of his rights under Article 31 and asked if he still wanted' to talk,

the accused said he "would." He told Thomson he had a second fight with Ford and left him on the beach in an unconscious state. Thomson and the accused returned to the office to enable the accused to make a written statement. At the office, the accused said he "would like to have counsel." Asked if he desired any particular counsel, the accused replied he wanted to talk to Lieutenant May, the Regimental Legal Officer. Thomson called Sergeant Bogle, another investigator, to inform him of the accused's statement and request for counsel. A few minutes later, Bogle appeared with either the Battalion or Regimental Commander and the Battalion Legal Officer. The latter informed Thomson that Lieutenant May was "out for the evening." The accused was then asked if he wanted to speak to the Battalion Legal Officer, who was available. The accused said he just wanted to talk to Lieutenant May. Informed of the Lieutenant's absence and asked if he "still want[ed] to make the statement," he said " 'yes.' " Thomson again advised him of his rights under Article 31. He then asked questions, and reduced the accused's answers to writing. According to Thomson, the accused conferred with Lieutenant May on November 15, and did not thereafter indicate any desire to see Lieutenant May or "any other officer as counsel."

The accused's testimony about the November 14 statement is very meager. Its substance is that Thomson did not accurately record all he told him about the second fight; as he said: "I did make" the statement, but not "in those words," and I "tried to correct some of the mistakes." He did not deny he sought out Thomson to tell him he thought he was the one who killed Ford; nor did he deny he was advised of his rights under Article 31. His only reference to his request to talk to Lieutenant May is as follows:

"Q. How many CID people questioned you before this statement was written for you?

"A. About four or five, sir. Four people—five people, I'm not sure.

"Q. And would you tell the court how you were being questioned?

582

"A. Just that it was—they didn't ask me, they just—again I had asked for legal counsel, anyway, because I had been in a fight with the man and they asked if—

"Q. Why did you ask for legal counsel?

"A. Well, sir, I had been in a fight with the man and it was down there on the beach and all I knew about it was that they had found FORD's body and he was supposed to have been drown, sir."

The accused's testimony does not contradict or impugn Thomson's representation that the accused knowingly and willingly first made the oral statement and then, with full knowledge of the absence of requested counsel, willingly rejected the proffer of available counsel and proceeded to dictate and sign the written statement. It is not surprising, therefore, that the written statement was admitted into evidence without defense objection. United States v Melville, 8 USCMA 597, 25 CMR 101. There is nothing in the evidence to show the accused was denied the opportunity to confer with Lieutenant May or any other counsel in regard to the November 14 statement; and there is no evidence to indicate that any of the circumstances of the execution of this statement tainted the statement of November 18. See United States v Askew, 14 USCMA 257, 34 CMR 37; United States v Cadman, 10 USCMA 222, 27 CMR 296; Hawkins v United States, 288 F2d 122, 125 (CA DC Cir) (1960).

We turn now to the November 18 statement. With his consent, the accused was taken to the Naha Office of Naval Intelligence to take a lie detector test. He was asked to make a statement. According to him, he said: "[Y]es, I'll make a statement, if you'll investigate all those marks" on Ford. He asked Thomson to "promise me that he would do this and I would make a statement." Thomson said he would. "[H]e started asking questions" and the accused "answered some of them." The accused wrote the final statement

in his own handwriting and signed it. He then asked Thomson again if he would investigate Ford's head wounds, and was assured the investigation would be made. In his rebuttal examination, Thomson admitted he discussed Ford's head wounds with the accused. The accused denied he had hit Ford on the head and said he "would like to know who done it." Thomson further testified it was "possible" he might have had this discussion with the accused on November 18th, but he thought it was either November 16th or 17th. He searched the beach for anything that could have been used to inflict the head wounds on Ford, but found nothing. He denied the accused told him he would sign the statement "if . . . [he] would promise to further investigate."

Only one circumstance in the execution of the November 18th statement bears even remotely on its voluntariness; that is the purported promise to continue the investigation. A promise to *discontinue* an investigation and " 'close out the case,' " which induces the accused to make an incriminating statement is improper; and the statment so obtained cannot be admitted in evidence against him. A promise of that kind is "in the nature of a final cessation of any prosecution in return" for the statement. United States v Dalrymple, 14 USCMA 307, 310, 34 CMR 87. If made, the promise here is exactly the opposite. It required Thomson to continue the investigation. Obviously, if the investigation produced nothing favorable to the accused, he would still be a suspect. In United States v Askew, supra, at page 262, we suggested that a "statement by police officers that they intended to check out an ordinary investigative lead," which does not refer to compulsory questioning of persons closely related to the accused, would not constitute an unlawful influence or inducement affecting the accused's freedom to speak or remain silent, within the meaning of Article 31 of the Uniform Code. Cf. United States v Parham, 14 USCMA 161, 33 CMR 373. The alleged promise

in this case appears to be no more than a generalized statement to continue the investigation and check out other leads. Certainly, such a promise is proper; and cannot be compared to the "illicit bargain" to induce a statement of an incriminatory nature which the Court condemned in United States v Askew, supra, at page 263. Nevertheless, assuming the promise was of a kind that could be said to affect the voluntariness of the November 18th statement, the issue was fully presented to the court-martial for its consideration.

The law officer instructed the court-martial that his ruling on the November 18th statement merely admitted it into evidence; each member had to decide for himself whether the statement was voluntary. He also instructed that if the statement resulted from a promise which was the "effective cause of obtaining" it, there was unlawful influence or inducement, but a "promise of advantage which was of a trivial or insubstantial nature in the light of the known consequences of making the statement" did not "[o]rdinarily" require rejection of the statement as involuntary.

For the purposes of this appeal we may accept as principle, rather than dictum, that " 'any . . . promises, however slight,' " which induce the making of an incriminatory statement render it involuntary. 3 Russell on Crimes, 6th ed, page 478, cited with approval in Bram v United States, 168 US 532, 42 L ed 568, 573, 18 S Ct 183, 187 (1897). See also Shotwell Mfg. Co. v United States, 371 US 341, 9 L ed 2d 357, 83 S Ct 448 (1963); United States v Askew, supra. On that basis, an instruction to the effect that a trivial or insubstantial promise is not sufficient to brand a statement as involuntary would be error. The instruction here, of course, is not so phrased. On the contrary, it clearly implies that a trivial or insubstantial promise can invalidate a pretrial statement. True, the strength of implication is somewhat lessened by the qualifying word

"ordinarily," but a reading of the whole instruction leaves clear that, whether substantial or trivial, the court had to consider if the alleged promise to continue the investigation was the "effective cause" of the November 18th statement, and that it had to "determine beyond a reasonable doubt that . . . [the statement] was voluntary." We are satisfied there is no fair risk that the court-martial drew a "harmful conclusion" from the law officer's use of the word "ordinarily." United States v Ball, 8 USCMA 25, 32, 23 CMR 249.

The decision of the board of review as to the findings of guilty and the sentence and the board of review's denial of the petition for new trial are affirmed. The separate petition for a new trial filed in this Court is denied.

Judge KILDAY concurs.

FERGUSON, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

While I agree with the principal opinion in the result which it reaches concerning the sufficiency of the evidence to support the findings of guilty as approved by the board of review and its disposition of other of the questions before us, with all respect, I must note my diametric opposition to its discussion and rejection of the assignments regarding the refusal of the law officer to allow the court to recall Private First Class Charles H. Williams as a witness and the sufficiency of the instructions regarding the voluntariness of accused's statements. In my opinion, the court was denied the opportunity to develop further relevant and material testimony from the witness whom even the Chief Judge denominates as "next to the accused . . . probably the most important witness for the defense." I am also of the view that the majority's holding that the law officer's instructions regarding voluntariness were sufficient simply disregards every case which we have had on the subject from United States v Acfalle, 12 USCMA 465, 31 CMR 51, to United States v Murphy, 14 USCMA 535, 34 CMR 315. As has frequently

occurred, the instructions simply paraded before the lay members of the court a series of unconnected legal concepts quite without regard for the actual contentions of the accused. Such, I believe, demands reversive action on our part.

## I

At approximately 7:10 a.m., on the morning of November 13, 1961, Private First Class Williams, while performing police call on a beach behind Barracks 3637, Camp Schwab, Okinawa, discovered the body of Corporal Stroman L. Ford. The corpse was lying in the edge of the water, with its head pointed inland, and the tide washing around its waist. While examining Ford's remains, Williams touched his stomach, "and water came from his mouth." Williams and a Corporal Heidel moved the body up on the beach in order to prevent it from being covered by the tide.

The matter was promptly reported, causing First Lieutenant McGowan, Company Commander of the accused, and Corporal Ford, to come to the beach along with "all the Staff from the Company." Williams observed a wound on the left side of Ford's head and a gash over his left eye, both of which were surrounded by dried blood.

Williams further testified, over unsuccessful objection by the prosecution, that he had last seen the deceased alive in the barracks head between 12:30 a.m. and 3:30 a.m. on the same morning. He was not then wearing a watch but arrived at the time period stated as follows:

"Well the reason I say 12:30 was because I figured I went to hit the pad about 10:30 and I'd say it took me at least a half hour to sleep. So, I did sleep sometime so I just figured 12:30 to 3:30, because when I figured I hit the rack again there was a period of time before reville [sic] went."

The witness also declared that he had been in the habit of making a "head call" at a "fairly regular time at night" during the past fifteen and one-half months. He normally undertook this activity at "[a]bout 2 o'clock in the morning," but could not say it was "just as likely" that he saw Ford in the head at this hour as earlier or later. However, on the day of the incident, he had originally informed the CID investigators that he saw the victim alive for the last time "between 2:30 and 3:30."

Subsequently recalled as a witness for the defense, Williams declared that, at the time he saw Corporal Ford in the head, he "had on a dark blue shirt and a skivvy shirt under it and dark trousers." No one else was in the head, but Williams could hear other people in the barracks talking. He did not notice "any marks or bruises" on Ford, and could not tell if his clothes were "wet or sandy." During this appearance, Williams was not queried concerning the time period during which he saw Ford, nor concerning the discrepancy between his testimony and his initial statement to the criminal investigators.

Lieutenant Paul D. Urnes, a qualified medical doctor, examined Ford's body at approximately 7:30 a.m. He pronounced Ford dead, noticed two lacerations on the left side of his head, a soft spongy area on the left side of his head, and some abrasions of the skin on his back. From the physical signs present, it was his conclusion that Ford had drowned. At the time, rigor mortis had set in.

According to Dr. Urnes, the soft spongy injury on the left side of Ford's head was of a type which might have been caused by a blunt instrument.

An autopsy conducted on Ford's body by Dr. Stewart A. Chamblin generally confirmed Dr. Urnes' medical conclusions. Dr. Chamblin found the cause of death to be pulmonary edema and drowning. He, too, found several large bruises and small cuts about the head. He also discovered "one other large one on the left parietal area of the skull." These wounds were, in Dr. Chamblin's opinion, inflicted before death and, as had been noted by Dr. Urnes, the large injury on the left side of the head "could have been due to a blow from some object or it could have

**585**

been due to a fall." Dr. Chamblin was further of the view that Ford had probably died between 3:15 p.m., on November 12, 1961, and 5:15 a.m., on November 13, 1961.

During the autopsy, it was found that Ford's blood contained a high level of barbiturate content, which, depending upon various factors, might cause anything "from drowsyness [sic] or sleepiness to actual unconsciousness or even . . . hyperactivity, similar to alcohol."

Having established the foregoing matters, the prosecution offered in evidence an oral statement by the accused made on November 18, 1961, to a Corporal Thomson and a written statement made on the same date to the same investigator, which contained the substance of his oral declarations. In an extensive out-of-court hearing, accused contested the voluntariness of these statements, but, on the basis of the proof adduced by the prosecution, was overruled by the law officer. When the matter was brought to the attention of the court members, defense counsel objected again to the receipt of the statements on the ground of voluntariness, but reserved the right to present its evidence to the court until presentation of its case-in-chief.

Corporal Grant E. Keys testified on behalf of the defense that he broke up a fight between the accused and Corporal Ford at approximately 11:00 or 12:00 p.m. on the evening of November 12, 1961. Rogers was "holding Corporal FORD down" and did not seem interested in pursuing the fight. After separating the parties, he noticed that Rogers went around behind the barracks, while Ford, after stating that he wished to talk to Rogers, also left and went in the door on the barracks' side. Accused appeared to be, sober, while Ford was intoxicated. Several fights occurred in the company area during that evening, and it is apparent from the record that a drunken party was in progress, apparently celebrating the unit's imminent departure to the United States.

Private Rogers, appearing as a witness in his own behalf, declared that he and Corporal Ford met at the Enlisted Men's Club at approximately 9:00 p.m. on November 12. They engaged in desultory conversation, and accused left, returning to his company area. At some time after 10:00 p.m., Ford came back to the area, just as Private Bauer was leaving the barracks. Ford wrapped his arms about Rogers, who, to free himself, tripped him. Ford arose and began to punch Rogers, causing him to fall. Ford then ran up to Bauer and knocked him down.

Ford then returned to the accused, who, after a scuffle, managed to pin him with a wrestling grip. At that time, the parties were separated by Corporal Keys, Corporal Helms, and Private First Class Graham.

Following this incident, Rogers walked around behind the barracks and laid down on the grass. In a few minutes, he was joined by Private Bauer. Immediately thereafter, Corporal Ford came out of the barracks, walked toward Rogers, and called his name. Rogers replied, and Ford ran toward him, the parties commencing to fight again, with both falling over a six-foot bank. Bauer jumped off the bank and "pulled Corporal FORD off me." Rogers described what thereafter ensued in the following testimony:

". . . He [Bauer] got on top of him and tried to hold him down. FORD kept on fighting and called him names and I got up and I saw that he was trying to knee BAUER in his back, sir, with his leg. So, I sat on his leg. Then I saw Private BAUER had a knife in his hand, sir. Well I saw the knife and I got off FORD's legs and I grabbed at the knife and put it in my pocket, sir. Then Corporal FORD started fighting with BAUER again and so, I got on him again and tried to hold him down. Then he stopped fighting, sir. He put his hands over his chest and just sort of smiled and looked at us. So, I told him, 'Come on back to the barracks with us and stop fooling around' and he said something, I really don't remember what it was that he said, sir. I told him 'Come on'. So, I got on one side

586

of him and Private BAUER got on the other side of him and grabbed hold of him and pulled him up on his feet. Well, he didn't seem like he was going to go up to the barracks, sir. So, I told BAUER to take him down by the beach. So, I told FORD 'I'll make you get up and make you walk, let's go'. So we carried him underneath his arms and we got down on the coral, sir. And while he layed [sic] down.—And at this time the waves were coming in and hitting on the end of the coral and splashing up on the rock. Well, when a wave would come in, Private BAUER put his head underneath the spray as it would come up over and threw some water on his face. We told him 'Come on'. Well, he didn't say anything, he just held his hands over his chest and stomach. I got up and I told him to come on and he didn't say anything to me. So I gave him a nudge with my foot and told him 'Come on'. We turned around and went back up to the Company area, sir, Private BAUER and I."

According to accused, he and Bauer left Ford on the coral. He gave the knife involved back to Bauer and told him never to use it. Following this incident, accused assumed the fire watch in the barracks at 11:00 p.m. He denied striking Ford with anything but his hands and then only once or twice. As a result of this, "there was no blood or anything." He expressly denied killing Ford.

Testifying in support of the admissibility of accused's statements, Corporal Thomson declared that he, Sergeant Collier, and Sergeant Bogle interrogated Rogers in connection with Ford's death. The questioning began on November 13, 1961, and continued spasmodically through November 18, 1961. Before each interview, accused was advised of his rights under Uniform Code of Military Justice, Article 31, 10 USC § 831, and told that he was a suspect in the homicide. He was first questioned during the late afternoon of November 13th. The statements offered in evidence were obtained on the afternoon of November

18th. Thomson was present during the period when Sergeant Collier advised the accused of his rights under Code, supra, Article 31. He was asked to leave the room and did so. A short while later, he was called back into the room and "Sergeant COLLIER said that the accused wanted to tell me something." Thomson again informed the accused of his rights under Article 31, "asked him a few questions," and received an oral statement in which accused detailed the two fights with Ford, declared he and Bauer had rendered their victim unconscious "by choking and punching him and threw a couple of handfuls of sand in his face," and "dragged FORD's body down to the water and threw him in." Following the delivery of this oral statement, accused reduced it to writing and in no way indicated any reluctance to do so.

Thomson conceded that, although accused denied striking Ford with any blunt instrument, such was not included in the statement. He also declared that Rogers "was . . . particularly concerned about the fact that FORD had been beat about the head." As to Rogers asking him to "take steps to try to find the person that possibly made that injury," Thomson admitted "there were some statements made to that effect but I don't know exactly what it was at this time." He denied promising accused he would continue the investigation.

According to the accused, on November 13, he was called down to the beach by his commanding officer, Lieutenant McGowan, who "asked me if I had been in a fight with Corporal FORD the night before and I told him yes, I had been." McGowan then asked Rogers if he knew his rights under Code, supra, Article 31, and upon receiving an affirmative reply, sent him "to the office," with instructions to remain there. At some time during the afternoon, the criminal investigators began to question him. His description of the interrogations which followed is graphic:

"Well, it wasn't so much a form of questioning, sir. It was 'You did this' and 'I know you killed that man'

and 'You little bastard' and things like that and what I did, what I did not, what did you do and you did that and you did that——

. . . . .

". . . They would come in there and I remember there was an Okinawan and four in the room questioning me and then one or two would go, then they'd all leave the room and one would come back—or maybe two would come in. Sergeant BOGLE would tell me I did this and I did that and Corporal THOMSON would tell me 'I'm not like them guys' this stuff; that you did this, and through the whole period it was just over and over, different people at different times.

. . . . .

"Well, sir, they had been questioning me every day from the day that they found Corporal FORD. At different times—it wasn't completely all day, but some of the hours during the day they'd wake me up and in the afternoon when I'd be sleeping they'd come down and wake me up and ask me more questions. Then they told me they wanted me to take me down to Naha on the 18th to take a polygraph test. I told them I would go down there and take it. Well they picked me up at Camp Butler Brig and then we went by the Joint Services Stockade and picked up Private BAUER, sir. And we got down to Naha and they had all of us in one room and I believe it was COLLIER, sir, I'm not sure, what his name is, he is a criminal investigator, sir. And they asked us if either one of us wanted to make a head call. Well I was in one room and they took BAUER to the other room, sir. And I said I didn't want to go. Private BAUER got up and he went in there, sir. When he was in there I heard glass break and when I got up to run in to see what had happened, the door was closed—I started to open the door and this man that had been watching us started yelling 'Help me' 'Help me', or something to that effect and I hadn't gone into the head. I just opened the door and was standing

there. And he started in and I went by him and grabbed BAUER by the shirt and pulled him out of the room. I asked him why—well the rest came out of the office. He had been locked in there, sir. I guess they finally got the door open and they came in and took BAUER out and they told me to sit in this room. I went in there and Corporal THOMSON came in there and they took him to the dispensary.

. . . . .

"They took BAUER. And Sergeant BOGLE went with him. And I don't know who else. Then he had been gone for about three minutes or something around there or around five minutes or something like that. And they took me in a room and—in the office down at the end of the hall. They started asking me to make a statement. I said yes, I'll make a statement, if you'll investigate all those marks this man had on him. So he told me that—he promised me that he would. I asked him to promise me that he would do this and I would make a statement. Well he said he would. So he started asking questions and I answered some of them. And he told me that I did this, and to write out a statement. Well I wrote out this statement, sir, and he told me to sign it, sir. Sign it here and so I signed it and I asked him again if he'd make sure that he would investigate these marks. And he said he would. Then they brought BAUER back in and they took him—whatever happened to him—they didn't give us a polyograph [sic]."

Another pretrial statement of the accused, obtained from him on November 13, was received in evidence during accused's cross-examination for the purpose of showing a prior inconsistent statement. A second statement to the criminal investigators was similarly offered but initially refused admission when it appeared through examination of the accused that he "had asked for legal counsel."

In rebuttal, however, the prosecution recalled Corporal Thomson, who testi-

fied with respect to the circumstances surrounding the obtaining of this statement from the accused on November 14. It was received in evidence without defense objection when it appeared that the accused had come to Thomson and volunteered the information, " 'I think I'm the man who killed FORD,' " and went on to state that he had been involved in a fight with him. After this, accused "said that he would like to have counsel and I said any particular counsel and he said yes I would like to talk to Lieutenant MAY, the Regimental Legal Officer." Thomson took the accused to Regimental Headquarters, found that Lieutenant May was absent for the evening, and so notified Rogers. He then asked him if he wished to speak to the Battalion Legal Officer, and he replied that he only wished to speak with Lieutenant May.[1] As May was not available, Corporal Thomson inquired if accused still wished to reduce his oral statement to writing, and Rogers replied that he did. The statement was then accomplished by accused's dictating its contents to Thomson.

## II

The first issue which warrants our reversal of the decision of the board of review involves the refusal of the law officer to permit the recall of Private First Class Williams. This arose as follows:

"LO: Does the court desire any witnesses be called or recalled.

"Hand written note passed from the court to the Law Officer.

"LO: The difference in the testimony—where there are discrepancies in testimony of two witnesses, is something this court will have to,— be resolved by the court. As far as my ruling on this—it would appear that counsel has pretty well exhausted the testimony of each witness. This note will also be marked as an Appellate Exhibit and appended to the record. Are there any questions or witnesses?"

The "Hand written note" in issue reads as follows:

"From:
Rogers testimony—
Ford left on coral at about 2300
Williams testimony
Last saw Ford in head about 1230–0330

"Therefore:
Suggest further interrogation of *Williams* to determine:
1. Whether, in fact, it was Ford he saw in head.
2. If so, the time of the meeting more accurately." [Appellate Exhibit VII.]

In addition, it should be noted that, at the outset of the trial, the law officer gave the court members the following general instructions concerning their conduct during the trial:

"During the trial of this case, you may consider it necessary after counsel for both sides have completed their examination of a witness to obtain additional testimony, either to clarify some obscurity concerning the issue or for further information that you may desire. *Questions asked by the members of the court for this purpose will be subject to*

---

[1] It should be noted that, in accordance with Marine Corps practice, neither Lieutenant May nor the Battalion Legal Officer were lawyers. Lieutenant May and the accused, however, came from a common hometown, and were friendly. In the out-of-court hearing on the admissibility of the November 18th statement, evidence was presented which indicated that the accused, through Lieutenant May, made an official request to have legally qualified counsel consult with him on November 13. This request was not honored until after he made his final statement on November 18. While the record does not reflect the reason for this delay, appellate defense counsel, who also represented accused at trial, indicate that it occurred through erroneous use of a form designed to obtain representation at the pretrial investigation. Lieutenant May was not called as a witness and this contention on the part of the accused was not presented to the court members, counsel apparently electing to have it considered solely by the law officer.

*objection by either counsel or by myself, and such objection is not a reflection upon the inquiring member. However, I'm going to insist that in posing your questions that you write them out and hand them to me so that I can examine them prior to their being asked. Then I can ask the question or at my direction have the counsel probe further into the matter which is concerned here.*

"Now, after both sides have rested their case *you will have at that time an opportunity to recall any witness or to have additional witnesses or evidence secured. Once again, if you desire to recall a witness or call an additional witness that has not been called, who may seem to you to have some knowledge of the case, at that time make the issue of concern to you known to me and I will have the counsel probe into it."* [Emphasis supplied.]

In an out-of-court hearing on instructions following the colloquy between the court and the law officer concerning additional interrogation of Williams, defense counsel expressed concern over the matter and the comments which had been made with respect thereto. He called the law officer's attention to his "taking and refusing to or in electing not to recall the witness in order to further clarify the matter as presented by the member," and stated his belief that there was no conflict between Williams' testimony and that of the accused. He requested an instruction to that effect, with further advice to the court that "If the court member desires that that witness [Williams] be recalled, he may so inform the court."

The law officer refused so to advise the court and, in lieu thereof, informed it that the question whether there was any conflict between the accused's testimony and that of Williams was solely one for the members themselves to determine.

In United States v Parker, 7 USCMA 182, 21 CMR 308, this Court was presented with the issue whether the board of review was correct in disapproving the findings of guilty on the

basis that the court itself erred in requesting the introduction of additional evidence—subsequently presented by the prosecution—after it had retired to deliberate on its findings. Reviewing civil authorities in which an analogous situation was presented, we stated our approval of the rule set forth in paragraph 54*b*, Manual for Courts-Martial, United States, 1951, which provides:

"The court is not obliged to content itself with the evidence adduced by the parties. When such evidence appears to be insufficient for a proper determination of the matter before it, or when not satisfied that it has received all available admissible evidence on an issue before it, *the court may take appropriate action with a view to obtaining available additional evidence.* The court may, for instance, require the trial counsel to recall a witness, to summon new witnesses, or to make an investigation or inquiry along certain lines with a view to discovering and producing additional evidence." [Emphasis supplied.]

Such has been the rule in military law since time immemorial. Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, pages 286, 287, 375. In upholding it under the Uniform Code, we pointed out that it was discretionary *with the court members* "as to whether or not the court will order further evidence to be introduced after it has retired to deliberate on the findings." Finally, cognizant of the role of the military judge, we declared, at page 186:

". . . In reaching this determination we have not overlooked the provision in the procedural guide of the Manual (page 517) that the law officer 'will rule finally as to whether the witness will be called.' Nor do we ignore Article 51(*b*) of the Code that makes interlocutory rulings by the law officer final. *In construing these two provisions, together with the procedure authorized in paragraph 54b of the Manual, we hold that a court-martial has the unrestricted right to call for further witnesses, subject only to the law offi-*

cer's determination of admissibility." [Emphasis supplied.]

Again, in United States v Duncan, 9 USCMA 465, 26 CMR 245, the Court noted, at page 468, that if court members deem "factual situations are underdeveloped or unclear, they are entitled to ask clarifying questions." Cf. United States v Butler, 13 USCMA 260, 32 CMR 260. And in United States v Blankenship, 7 USCMA 328, 22 CMR 118, Chief Judge Quinn declared for the Court, at page 333:

". . . In military law, a court member has a right to question a witness. United States v Sears, 6 USCMA 661, 20 CMR 377; United States v Smith, 6 USCMA 521, 20 CMR 237. He can also request that a witness' testimony be reread, or that the witness himself be recalled and reexamined. United States v Parker, 7 USCMA 182, 21 CMR 308. In the latter instance, the request can be made even after the court has for a time deliberated upon the findings. United States v Parker, supra."

The Court noted that the members' privilege did not extend to their becoming partisan advocates for either side and, in order to control this aspect of the members' right to call for further evidence, Judge Latimer stated, in his separate concurring opinion, at page 336:

". . . If, thereafter, members seek to ask questions, the law officer can determine the nature of the testimony desired. He must rule on the competency, materiality, and relevancy of the desired information, and he can do that in advance, if necessary."

The sum total of these holdings indicates to me that, unlike the civilian jurisdictions to which my brothers refer, a court-martial member has a right to ask questions, call for the production of further evidence, or recall a witness for additional examination, so long as he does not become a partisan advocate. United States v Parker, supra; United States v Blankenship, supra; United States v Flagg, 11 USCMA 636, 29 CMR 452. Of course, his examination of such evidence or witnesses is subject to rulings by the law officer as to competency, materiality, and relevancy, just as if the proof were adduced by counsel for either side. United States v Blankenship, supra, concurring opinion of Judge Latimer; United States v Parker, supra; United States v Butler, supra. But it is flatly erroneous to state that whether the member may call for further evidence is a matter lying within the discretion of the law officer. So to declare is in direct contradiction of our holding in *Parker*, supra, that "a court-martial has *the unrestricted right to call for further witnesses*, subject only to the law officer's determination of admissibility." (Emphasis supplied.) United States v Parker, at page 186. And I further draw my brothers' attention to the statement in *Blankenship*, supra, that the court member has a "right" to question witnesses, or to have them recalled and further examined. United States v Blankenship, supra, at page 333.

These precedents, reached with remarkable unanimity on the part of the Court, were not lightly decided. They import a consideration of the different, discretionary rule in civil courts, and reflect the differing nature and historical development of military judicial bodies, which from the beginning combined in the members both fact-finding and legal functions. Winthrop, supra, pages 286, 287. Indeed, it was only with the passage of the Code that the law officer became an entity separate from the court and ceased to participate in their closed session deliberations on the guilt or innocence of the accused. Code, supra, Article 39, 10 USC § 839; United States v Sears, 6 USCMA 661, 20 CMR 377.

For these reasons, therefore, and particularly in light of our prior decisions, I would conclude that the law officer erred in refusing to permit the court member to recall Private First Class Williams and further to examine him concerning his certainty that it was Ford he saw in the barracks head and the hour at which this transaction occurred. The prejudicial nature of this error is fully demonstrable on the

record, for, if Williams is believed or sufficient credence accorded his testimony to raise a reasonable doubt, then accused's actions could not have been responsible for Ford's death. The latter would then have been observed alive and well hours after accused's purported assault upon him and leaving him in a place of danger. It would have been open to the court to infer that, in light of being so seen, Ford's admitted barbiturate intoxication, accused's unimpeached declaration that he went on watch at 11:00 p.m., and the apparently inexplicable head injury, the victim returned to the barracks after his encounter with the accused and later met his death under unknown circumstances on the beach. That such is not a web of improbable speculation is shown not only by the Chief Judge's development of the evidence and the facts set out above but also by the fact that the Unit to which accused and Ford belonged was apparently engaged in a night long drunken brawl during which, according to the witnesses, fights commonly occurred. In sum, the testimony of Williams—concededly the most important witness in the case next to the accused—was material, relevant, and competent, and the law officer erred prejudicially when he denied the court the right further to develop proof which undeniably might have reasonably led to accused's outright acquittal.

Turning to the rationale of the principal opinion, I suggest that it errs by initially implying the member's note did not constitute a request to recall Williams as a witness on behalf of the court. First, at the outset of the trial, the law officer instructed the court that it had the right to question witnesses and to seek out further evidence, but suggested that such questions be submitted in writing. In fact, several such notes to the law officer are attached to the record. Cf. United States v Blankenship, supra. Immediately before the member's note was handed to him, the law officer inquired of the court if it desired any witness recalled.

The note came as a written response to that question, and from the record quoted above, it was intended to secure the recall of Williams. The law officer's ruling indicates that he so treated it, as does the defense counsel's objection and request for an additional instruction. I suggest, therefore, that it ill-behooves us to cast doubt on a matter which was so plainly apparent to all the parties to the trial. Any fair reading of the record compels the conclusion that the member not only sought the recall of Williams but indicated the area into which he wished, in accordance with the law officer's earlier instructions, specific inquiry to be made.

Secondly, from what I have set out heretofore, it is apparent that I disagree with the concept that it is discretionary with the law officer whether to permit the court to recall witnesses or hear further evidence on what was probably the most important factual question in the case. United States v Blankenship, supra; United States v Parker, supra. But even assuming the existence of discretion on his part in this area, the ruling would clearly be an abuse in this case. The principal opinion rests its propriety on the claim that Williams had been exhaustively examined on this subject. I call attention to the fact that his entire testimony with relation to this issue, both as a witness for the Government and on behalf of the defense, constituted approximately eight pages, including the lengthy arguments by prosecution and defense on certain objections. This hardly indicates to me that so important a subject had been exhausted, and it is apparent from the member's request that he, who, in the words of Code, supra, Article 66, 10 USC § 866, "saw and heard the witnesses," felt that additional development was necessary, undoubtedly because, at the time Williams was originally on the stand, it had not become clear that Ford had suffered head injuries which could not definitely be brought home to the accused and Bauer.[2]

---

[2] It was, of course, open to the court-martial to infer that accused and Bauer did inflict the injury upon Ford's left parietal area with any one of the numerous rocks, beer bottles, or steel bunk adapters, which Corporal Thom-

I am, therefore, unable to agree with the majority's disposition of this assignment of error. On this ground alone, I would find the existence of error prejudicial to the substantial rights of the accused, and reverse the decision of the board of review.

### III

There is, however, as indicated by the evidence set out above and in the Court's opinion, another matter which merits ordering a rehearing in this case, if our prior opinions on instructional matters in connection with the use of confessions are to be accorded any weight whatsoever.

Having admitted accused's oral and written statements of November 18 into evidence and thereby permitting the court members to consider his pretrial admission that the incidents with Ford ended with him and Bauer throwing their victim into the sea, the law officer advised the fact finders as follows:

"You are advised that my ruling admitting Prosecution Exhibit 13, the out-of-court statement of the accused, into evidence is final only on the question of admissibility. My ruling merely places the statement before the court. It does not conclusively establish the voluntary nature of the statement. Each of you in your deliberations upon the finding of guilt or innocence may come to your own conclusion as to the voluntary nature of the statement. You may accept the statement as evidence only if you determine beyond a reasonable doubt that it was voluntary. If you determine that the statement was involuntary, you must reject it and disregard it as evidence in the case. Now you are further advised in this connection the out-of-court statement of the accused is not voluntary if it was obtained from the accused by the use of coercion, unlawful influence or unlawful inducement. Coercion, unlawful influence and unlawful inducement would be present if an accused made an incriminating out-of-court statement as a result of the infliction of bodily harm, prolonged questioning accompanied by deprivation of the necessities of life, such as food, sleep, adequate clothing, threats of bodily harm, the threat of imposition of confinement because a statement was not made by the accused, the threat of deprivation of privileges, or necessities because a statement was not made by the accused, the promise of immunity or clemency with respect to an offense allegedly committed by the accused, the promise of substantial reward or benefit likely to induce a confession. However, an incriminating out-of-court statement by the accused is not rendered involuntary by a promise which was not an effective cause of obtaining the statement. Ordinarily the statement of the accused need not be rejected as involuntary merely because it happened to be made after a promise of advantage which was of a trivial or insubstantial nature in the light of the known consequences of making the statement. Also I will further instruct you that an accused person or suspected person at the time of an investigation is entitled to counsel if he so requests it. After such a request is made and such a request is denied, any statement made under such conditions would be considered involuntary."

There can be no doubt that the testimony of the accused raises a substantial issue as to the voluntariness of his out-of-court statements. Within a short time after the discovery of Ford's body, an unwarned admission was obtained from Rogers by his commanding officer that he had been in a fight with the deceased during the preceding evening. Thereafter, he was subjected to questioning by various investigators during a period of approximately five days, each interrogation lasting for several hours. It appears further that he was questioned by relays of investi-

son testified were present at or near the scene of the crime. I, however, personally, am unable to see any basis in this record for an inference that such a fracture might be inflicted by a pocket knife wielded bludgeon-fashion.

gators, using time-honored techniques to worm from him a complete statement admitting responsibility for Ford's death. The tone of the questioning is shown by accused's assertions concerning the harsh epithets applied to him and the accusatory mode of the inquiries. Private Bauer was questioned during the same period by the same investigators and his purported attempt to commit suicide may be taken as a graphic illustration of the extent of the pressure which the military detectives brought to bear upon the two suspects during the course of their interviews. And it was immediately after the accused had witnessed this attempt that the investigators finally succeeded. Even then, he alleged that he elected to make his oral statement to Corporal Thomson and reduce it to writing only upon the promise that, if he did so, Thomson would continue his investigation and find the individual responsible for Ford's fractured skull and, thus, the person who was in fact responsible for Ford's demise.

We have long held that the question of voluntariness basically involves whether a statement was the product of an entirely free choice on his part, unencumbered by impermissive pressures. United States v Monge, 1 USCMA 95, 2 CMR 1. In that landmark decision, the Court declared, at page 97:

"Judicial suspicion of pre-trial confessions has led to the universal adoption of a rule that involuntary confessions will not be received in evidence against an accused. Many courts have based this rule of exclusion on reasoning that, where the confession is produced by inducements engendering either hope or fear, the accused is deprived of his freedom of will, and the presumption that an innocent man will not convict himself is overcome. The resulting confession is deemed untrustworthy as evidence. This basis for exclusion has been widely adopted in the state courts, . . . and has been utilized by the Supreme Court. . . . The federal courts—and many state courts—have adopted another

basis for the exclusion of confessions induced by force—that their use violates the constitutional privilege against self-incrimination. The Supreme Court has thus stated that the language of the Fifth Amendment is, in reality, a 'crystallization' of the common law doctrine excluding involuntary confessions. Bram v United States, 168 US 532, 543, 42 L ed 568, 573, 18 S Ct 183.

. . . . .

". . . The issue of voluntariness, as presented to the trial court, is usually one of fact. Basically, the question is whether the accused possessed, at the time of the confession, 'mental freedom' to confess or deny participation in the crime. Lyons v Oklahoma, 322 US 596, 602, 88 L ed 1481, 1484, 64 S Ct 1208."

The facts which the accused detailed to the court-martial might reasonably cause it to conclude that his will was overborne through lengthy interrogation by various agents unremittingly bent on obtaining a complete confession from him, regardless of his will, and one of whom finally resorted to the stratagem of promising to find the "real killer" if the accused would only give them his version of the incidents involved. Under such circumstances, it cannot be argued that there was not a strong issue raised concerning whether he possessed fully his mental freedom to speak or remain silent. United States v Monge, supra; United States v Acfalle, 12 USCMA 465, 31 CMR 51. And, as we noted in *Monge*, supra, at page 98, under such circumstances, "the trial forum is not only better equipped but has the legal duty to weigh the evidence and decide whether the confession is, in fact, voluntary," taking into consideration the possible effect of Lieutenant Mc-Gowan's unwarned interrogation, the length of the questioning, the number of interrogators, the methods which they used, and, finally, Thomson's alleged promise to find the person who fractured Ford's skull.

It is precisely the importance of the court-martial's consideration of the evidence surrounding the taking of an

594

accused's confession that led us to require, in United States v Acfalle, supra, the submission of the issue of voluntariness to the members under instructions in which the factual contentions of the parties are so interrelated to the law applicable that the court will be guided unerringly in its determination of this question.

The instructions which we condemned in the *Acfalle* case are almost identical to those now before us. There, in reversing, we stated, at page 469:

"The law officer's advice consists of no more than a bare recital of the conclusions which the court members must reach before the confessions could be considered. Only at one place did he refer to the question whether accused possessed mental freedom during his interrogations, but, even then, he did not relate that inquiry to the facts before the court-martial. . . . Thus, unless their attention was directed to the evidence regarding voluntariness and its connection with accused's claim that he succumbed to the pressures thus brought against him, it is not probable that they made any meaningful determination concerning his confessions."

Since the decision in *Acfalle*, supra, the Court has consistently reached the same result with regard to such generalized, form book advice on the voluntariness of confessions. Thus, in United States v Shanks, 12 USCMA 586, 31 CMR 172, we unanimously declared, at page 588, of such advice:

"The difficulty with the record now before us is that it discloses no meaningful submission of this important question to the court-martial. True, the president gave a general instruction on 'voluntariness,' but he made no mention of the possible effect of Kerrin's acts on the statements made to Craig or of the need to find that these were not motivated by the fear earlier instilled in him. In short, no attempt was made by the president to tailor his instructions regarding the statements to the evidentiary situation before him. United States

v Acfalle, 12 USCMA 465, 31 CMR 51. Reversal is required, for accused was entitled to have that issue properly resolved."

Again, in United States v Askew, 14 USCMA 257, 34 CMR 37, we said, at page 264, of the same instruction:

"The advice to the court here, completely untailored to the contentions of the parties and devoid of any mention of the effect of the use of the illegally seized letters, was insufficient to inform it of either the legal principles involved or how they might be applied to the factual matters. The members were left to rummage unguided among assorted legal concepts with no real information concerning their bearing upon the evidence or issues. Compare United States v Acfalle, supra. Under the circumstances, there is more than a fair risk that the court neither recognized nor resolved the real questions presented. We conclude, therefore, that the instructions were prejudicially insufficient."

In United States v Tanner, 14 USCMA 447, 34 CMR 227, we reached the same result, holding "what is required in every case, as we have on many occasions reiterated, is a meaningful submission of the interrelationship between the evidence and the law to the court-martial." United States v Tanner, supra, at page 451; cf. United States v Smith, 13 USCMA 471, 33 CMR 3. Indeed, as recently as last month, we again condemned this generalized instruction on voluntariness in United States v Murphy, 14 USCMA 535, 34 CMR 315.

This unbroken line of precedent unequivocally establishes the prejudicially erroneous character of the law officer's instructions on voluntariness in this case, for he failed utterly to relate the generalized legal concepts which he delivered to the court-martial in any way to the accused's contentions of abuse and attempted in nowise to guide them accurately in their deliberations. Indeed, he made no mention of the basic legal concept involved, *i.e.*, freedom of will. United States v Acfalle; United States v Monge, both supra. In short,

he gave the court a series of legal conclusions to which they should come concerning the statement and offered them no real guidance at all.

Turning from the general character of the instructions to particular provisions, it is also apparent that he prejudicially misled them. In this respect, I invite attention to his particular statement that:

". . . Ordinarily the statement of the accused need not be rejected as involuntary merely because it happened to be made after a promise of advantage which was of a trivial or insubstantial nature in the light of the known consequences of making the statement."

In the first instance, I cannot agree with the Chief Judge that the promise here involved can be so characterized, for, if the accused is to be believed, it was an assurance that the *quid pro quo* for his statement would be the discovery of the person who fractured Ford's skull and discovery of the real culprit. Such a promise is hardly insubstantial, nor does it merely involve checking out an investigative lead. The core of its meaning is that, in return for accused's cooperation, the agent would attempt to establish his innocence and thereby free him from the consequences of the situation in which he found himself. One can hardly imagine a more deadly engine created for the destruction of the will of an individual circumstanced as was Rogers.

Secondly, this Court squarely held in United States v Askew, supra, over the dissent of the Chief Judge, that a promise, however slight, might, depending upon the accused, give rise to an issue of voluntariness requiring precise instructions to the court-martial on the subject. There involved was an alleged promise not to have civilian police interrogate the accused's wife. While the Chief Judge expressly noted his disagreement, we quoted the following with approval:

"Speaking in general terms, the Supreme Court recently declared:

'. . . The controlling test is that approved in *Bram* (v United States, 168 US 532, 42 L ed 568, 18 S Ct 183 (1897)): " 'a confession, in order to be admissible, must be free and voluntary: that is, . . . not . . . obtained by any direct or implied promises, *however slight. . . .* ' " . . . . Evidence so procured can no more be regarded as the product of a free act of the accused than that obtained by official physical or psychological coercion.' (Shotwell Mfg. Co. v United States, 371 US 341, 347, 9 L ed 2d 357, 83 S Ct 448 (1963).)" [United States v Askew, supra, at page 261.] [Emphasis supplied.]

The principal opinion seeks to avoid the clear effect of this holding by declaring that, while telling the court that a trivial or insubstantial promise is not sufficient to render the statement involuntary would be erroneous, the instruction here "clearly implies" the opposite. To me, this is simply lingual legerdemain, for I am at a loss to see how anyone might interpret this instruction reasonably and come up with the conclusion it does not inform the military jury that, in the usual case, a promise of a trivial or insubstantial nature need not be considered as sufficient to cause it to reject accused's statement. Phrased as it is and without further elucidation or any attempt to tie it to the evidentiary contentions of the parties, it is grossly misleading and prejudicially erroneous. United States v Askew, supra; Shotwell Mfg. Co. v United States, 371 US 341, 9 L ed 2d 357, 83 S Ct 448 (1963).

In sum, I cannot fathom the reasoning of my brothers in refusing to follow the precedents which we have set down over the last three years in this area. An instruction repeatedly condemned, with conviction after conviction struck down, now calls forth the most ingenious attempts to sustain its validity. Not only is this sudden departure from well-reasoned precedent unexplained but it carries with it the air of concluding that, all things considered, some sort of rough justice was done in the premises when the board of review reduced the findings of guilty

to involuntary manslaughter, with a corresponding diminution in the punishment. True it is that the accused has now served his term of confinement, but he still labors under the heavy burden of an impending punitive discharge and what I deem to be a conviction of homicide by improper methods. I simply cannot believe that these factors ought to play any part in our decisions. Rather, out of fairness both to the United States and accused persons, we ought to attempt to apply the rules which we carve out under the Code without irrational distinction.

Only then can law officers hope to formulate instructions on a reasoned basis, and only then can an accused trust that he will be judged under the same rules which applied a fortnight ago. Rogers may be a killer, but he is entitled to a fair trial just as much as Murphy, Tanner, Askew, and Acfalle.

For the reasons set forth in this opinion, I would reverse the decision of the board of review and order a rehearing on the charge of involuntary manslaughter.