UNITED STATES, Appellee

v

ROBERT SEARS, Basic Airman, and CARL V. LEUZINGER, Basic Airman, U. S. Air Force, Appellants

6 USCMA 661, 20 CMR 377

No. 7130

Decided February 17, 1956

*Captain Frank Fedele* argued the cause for Appellants, Accused. With him on the brief were *Lieutenant Colonel Stanley S. Butt* and *Colonel A. W. Tolen.*

*Lieutenant Colonel Roger H. Miller* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Emanuel Lewis,* and *Major Stanley I. Harper.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The two appellants were convicted, at a joint trial by special court-martial convened at Sealand, Flintshire, Wales, of an aggravated assault, in violation of Article 128, Uniform Code of Military Justice, 50 USC § 722. Each was sentenced to receive a bad-conduct discharge, partial forfeitures, and confinement at hard labor for six months. All findings and both sentences were approved by the convening and supervisory authorities, and affirmed without opinion by a board of review in the office of The Judge Advocate General, United States Air Force. We granted petitions for review from both accused persons, limiting briefs and argument to two issues. The first of these—with which we will deal at length —has to do with the possibility of error in the court's refusal to sustain a challenge for cause directed against a court member by counsel for one of the petitioners.

A discussion of the facts giving rise to the present prosecutions is unneces-

sary since the appeal has come to us on grounds relating only to the administration of the hearing itself. The issue with which we are concerned arises out of the trial conduct of one of the members of the court-martial—as affected perhaps by certain pretrial activities within the command of the convening authority.

The joint trial of the two accused was scheduled originally for January 25, 1955, but at their request the hearing was postponed until February 8, 1955. In the interim, the accused, Sears, procured the services of. an individual civilian defense counsel, a local solicitor named Makin. On February 8, the Government requested a further delay of one week, and at the same time three additional members were named to the court-martial's membership—which originally had consisted of eight officers. All of these new appointees were qualified attorneys serving at the time with the Air Force as judge advocates —and two of the three were assigned as such at stations considerably removed from the place of trial. By virtue of his

**663**

military grade, the senior of the three —a lieutenant colonel—was necessarily designated as president of the court when the case came on for trial on February 15, 1955.

After an unsuccessful challenge for cause directed against this senior member, the latter was excused peremptorily by the accused, Sears—while Leuzinger, the other accused, exercised his single peremptory challenge against another of the three legal officer members. Prior to arraignment, Mr. Makin, individual counsel for the accused, Sears, requested a severance. This motion was granted by the officer then serving as president, but this ruling was the subject of objection from the remaining judge advocate member—a Captain Bennett. Following a closed vote the president was overruled, and the motion was denied.

The presentation by Government of its case-in-chief was marked by what may be characterized as vigorous activity on the part of all counsel, and it was observed by the defense that the president's several rulings were consistently adverse to its interests. Further, Captain Bennett was seen repeatedly to pass notes and memoranda to the president, which appear to have been utilized by the latter as the foundation for each ruling. Ultimately, the assigned military defense counsel for the accused, Leuzinger, directed a challenge for cause against Captain Bennett—basing his action on paragraph 62*f* (13) of the Manual for Courts-Martial, United States, 1951, which provides for a general ground of challenge predicated on "Any other facts indicating that . . . [the member] should not sit . . . in the interest of having the trial . . . free from substantial doubt as to legality, fairness, and impartiality." Mr. Makin joined in this challenge and sought to carry it forward. Thereupon, Captain Bennett was required to assume the stand for the purpose of testifying under oath regarding his competence to serve. The following colloquy ensued:

"MR. MAKIN (to Capt Bennett): On how many occasions have you passed notes, if you have passed any to the president of the court?

"CAPT BENNETT: Mr. Makin, before answering your question, I would like to say that it is my understanding that after arraignment of the court, any court member can be challenged as to any one of the first eight grounds in Par 62f. Therefore I think your motion is improper unless you state one of the first eight grounds. I would like to further say that I will be happy to answer any of your questions in order to satisfy you; but purely as a matter to satisfy you and not as a matter of right, unless you are basing your challenge—

"MR MAKIN: . . . I am perfectly in order to submit this challenge now . . . Do you agree with me that this challenge is in order? Or do you say that I have not exercised due diligence in making this challenge at an earlier time?

"CAPT BENNETT: I think I should reserve my opinion as to whether the challenge was in order."

And further:

"Questions by defense (MR MAKIN):

"Q How many notes have you passed?

A I have not counted them.

"Q Are they more than three or four?

A I don't know.

"Q Captain Bennett, you are an advocate here and I must ask you for a straightforward answer. How many do you think you have passed?

A Mr. Makin, one of my duties as a court member is to insure that matters proceed in an orderly fashion and that the evidence is given to the court. I have written several notes. I did not count them. I have written them only at a stage where I felt the President could and should be made aware of something that I thought was pertinent.

. . . . . .

"Q Isn't it a fact that on every occasion you have passed a note to the president concerning an objection made by me or against me, the ruling has been directed against me?

A Mr. Makin, you are assuming something that has not been established.

. . . . . .

"Q Do you agree that it is the president's duty here to rule on all interlocutory questions?

A Yes, I do.

"Q And if you have any objections, you can voice them . . .

A That is the proper procedure.

"Q And that it is not discreet, to put it mildly, that you should be passing notes which the president of the court apparently reads out when he gives his rulings?

A I don't agree with that."

Additional exchanges followed—after which the court was closed for a vote on the challenge. The court soon reopened, and the president announced that the challenge had been denied.

The first assignment of error necessitates an expression of our judgment on the discretion employed by the court below in retaining Captain Bennett as a member following his challenge for cause. Naturally, the denial of such a challenge constitutes a ■ ground for reversal only when an abuse of that discretion is present. United States v Dean, 5 USCMA 44, 49, 17 CMR 44, 49.

It is the settled law of this Court that a court member's duties are (1) to try the case before him ■ and (2) to assess an appropriate sentence, if guilt is determined thereby. If he foregoes these functions for those of an advocate or partisan, he is no longer competent to serve. United States v Carver, 6 USCMA 258, 19 CMR 384; United States v Smith, 6 USCMA 521, 20 CMR 237. However, we have held expressly in the past that—although ■ such an appointment is unusual—an attorney-member of a court-martial is not at all to be placed, necessarily and automatically, within these proscribed positions. Thus, his professional qualifications, as such and standing alone, will not make him subject to challenge. United States v Glaze, 3 USCMA 168, 11 CMR 168. In the Glaze case, appellate defense counsel attempted an analogy between the court-martial presence of an attorney-member, on the one hand, and, on the other, those instances in which the law officer, contrary to the statute, had participated in a closed session of the court—and contended that the concept of general prejudice is as fully applicable to the former situation as to the "closed conference" cases. In contrasting the situation, we had this to say:

". . . That theory [of general prejudice] is not applicable here as the two situations are poles apart. It is one matter to have a law officer, whose instructions the court is, by statute, required to follow, and who is directed not to consult with the members of the court except in the presence of the accused, participate in the deliberations of the court-martial, and another *to have a lawyer deliberate as a member of the court when he is on the same footing as other members.* One of the primary purposes of the Uniform Code of Military Justice was to make the law officer the judge of the trial and require the court to follow his instructions. *The lawyer who is a member of the court has no such power and authority.*" [Emphasis supplied.]

Both a *caveat*, and a limited reservation respecting an attorney's competence to act as a member of a court-martial, appear to be implicit within that decision. By this we mean that in it we were not willing to say—for reasons manifest both in the Manual and in the legislative background of the Uniform Code itself—that the very presence of a lawyer within the membership of a military tribunal is prejudicial *inherently.* At the same time, however, cognizance was taken of the obvious dangers involved in the court-martial use of one who might under some circumstances reduce to the status of a "professional juror." Therefore, his conduct of record must be scrutinized with an amount of circumspection considerably greater than that directed toward any other member. And any deviation from the limited role of mem-

**665**

ber in the direction of the more stimulating position of untitled law officer, and any undue attempt—by the use of superior technical background—to sway his fellows to a conclusion identical with his own, must of necessity result in disqualification and consequent removal.

Congress has made manifest its desire to terminate the existence of the old "law member," and to replace him with the present-day law officer—who is now removed from the court-martial physically, and who functions solely as "judge." Within such a framework, active participation by the law officer in the tribunal's deliberations could constitute conduct prejudicial to the rights of an accused. See United States v Allbee, 5 USCMA 448, 18 CMR 72.

With respect to managerial or administrative duties, those of the president of a special court-martial are—to all intents and purposes—identical with those by mandate exercised by the law officer of a general court. Article 51(c), Uniform Code of Military Justice, 50 USC § 626; paragraph 40b(2), Manual for Courts-Martial, supra; United States v Clark, 1 USCMA 201, 2 CMR 107; United States v Aldridge, 2 USCMA 330, 8 CMR 130. With respect to the surrender of presidential responsibilities to a member of a special court-martial—or the active assumption of them by the latter—the same result must obtain as would follow in a situation in which the law officer assumed to exercise fact-finding functions without warrant.

In reaching this conclusion we have not been unmindful of the contents of paragraph 4d of the Manual, which provides, when practicable, for the appointment of an attorney, qualified in the sense of Article 27(c) of the Code, 50 USC § 591, to membership in a special court-martial where "it is anticipated that complicated issues of law will be presented." Thus—in a proper case—the presence within the membership of a court-martial of an attorney-member cannot be said to be inherently prejudicial. Therefore, if the case before us now involved—on its face or by its very character—what might fairly be described as complicated issues of law, we would experience no hesitation in denying the propriety of any sort of examination into the presence of Captain Bennett as a member of the court *with respect to his character as a qualified attorney.* However, we cannot fail to recognize that the instant charge involved none of those complications with which paragraph 4d, supra, appears to have been concerned. The issues were simple and principally factual. In no sense can they be said to have been particularly complex. We can, and must, conclude, therefore, that the convening authority can have seen no *inherent* complications—but rather, on the basis of the history of the present cause, only *possible* and practical difficulties arising from the professional presence of the English solicitor, Mr. Makin, at the trial.

For a more detailed picture of Captain Bennett's performance as a court member, it is probable that an examination into the circumstances of his appointment may be of assistance. As has been seen previously, the court's original appointing order provided for eight members—with grades ranging from first lieutenant to lieutenant colonel. Two of these officers—one of whom would have occupied the senior position—were excused from service at the trial without stated reason. Therefore, as amended, the court-martial's membership included the three mentioned judge advocates, the senior of whom became the ranking officer present, plus six of the original members. Thus, the tribunal, as finally constituted, contained nine officers—three times that necessary for a quorum, and substantially in excess of that customary in the case of a special court-martial. In this connection it will be recalled that the case in suit was one of no particular moment or difficulty, and that time-wise the several new appointments were made immediately after the retention of Mr. Makin as individual counsel for the accused, Sears,

666

Had the court-martial here been one of normal size, we would perhaps hesitate to question the appointment of three additional officers. But in the present situation there appears to have been an extraordinary overage in the membership of the original *eight-man* court, six of whom were available for duty at the trial. Moreover, it is normally argued that judge advocate officers are in short supply—at too much of a premium, so to speak, to justify their mass assignment, at considerable expense to the Government in both time and travel funds, as members of a distinctly inferior court-martial to try a routine case. Naturally, we are loathe to indulge in speculation and conjecture in any juristic situation, but, in the present one, it may be said that we were not unduly surprised to find it suggested that there existed a very definite and specific reason for the detail of three legal officers—that is, qualified judge advocates—to the membership of this second-line tribunal. It is undeniable that the dubious timing of the new appointments supports this jaundiced view in some measure. And their number is unfortunate, too, for —as we have been reminded—the exercise of the two peremptory challenges available to the pair of joint accused persons could not fail to leave one recent attorney appointee safely within the membership of the court-martial.

With the urgent suggestion of these unhappy considerations in mind, let us turn to the conduct of the remaining judge advocate member. Initially—and as it was perfectly proper for him to do as a member of the court-martial— Captain Bennett objected to the president's grant of the defense motion for severance. After the court was closed for a consideration of this objection, the president's ruling was reversed. As the trial progressed, however, the former did not await the rendition of rulings by the presiding officer before attempting, if necessary, to amend them. Instead, he appears to have adhered to the following practice: he would set down in writing the ruling he deemed proper; his note would be delivered to the president; and according to the record assertion of defense counsel, the president would thereafter read the Captain's memorandum by way of ruling. We are left in some doubt as to the frequency of this procedure; however, it must be assumed from the record of trial that it was considerable.

Finally, Captain Bennett was challenged for "partiality." On taking the stand in this connection, much of his testimony was evasive and argumentative, and seems to have been calculated principally to reflect on the competence of the defense counsel who challenged him. All but a minor portion of this testimony may be construed with ease as an attempt to insure that the challenge lodged against him would be regarded by his fellow nonlawyer members as *technically* unsound—and refused on that basis, without consideration of whether it was basically in order. Indeed, this device may be said to have been remarkably successful, for in denying the challenge, the president had this to say:

"Pres: At this time I would like to state that the procedure of communicating with the president of the court by any other member of the court, by passing of notes, was perfectly legitimate. The basis of the arguments for the defense on the challenge of Captain Bennett have been insinuations that the note-passing has affected the decisions of the president of the court. *I would like to remind all concerned, and for insertion in the record, that each and every decision of the president of the court has been made subject to an objection by any member of the court. With the exception of the one decision made by me, to which Capt Bennett objected, there had been no other objections by any other member, on any other ruling.* Therefore, it is my ruling that the objection on the grounds of partiality on the part of Captain Bennett is overruled." [Emphasis supplied.]

It is patent that the president of the court-martial which tried the accused had surrendered control over the proceedings to Captain Bennett, following the latter's successful objection to the ruling of the senior member granting

the requested severance. Stated conversely, and perhaps with more demonstrable accuracy, we cannot say—in the sense in which we used the phrase in United States v Glaze, supra—that Captain Bennett had acted so as to remain "on the same footing" with other members of the court-martial. Instead, he appears to have used his superior technical background in a wholly successful attempt to manage the conduct of the trial. Viewed against a backdrop of the immediate, and perhaps suspicious, history of the case—and with emphasis on chronology—this conduct is particularly open to question.

The situation before us here is clearly distinguishable from that found in Glaze, for in that case there appeared no slightest suggestion that the attorney-member of the court had abandoned his role as fact finder for the broader one of law member at large. This conclusion is supported by the Captain's own testimony. Certainly, we must regard as being distinctly beyond the purview of the usual trier of fact—as contemplated by the Code and the Manual —his asserted conception of the duties as a court member to include insuring "that matters proceed in an orderly fashion and that the evidence is given to the court" and the writing and dispatch of notes "where I felt the President could and should be made aware of something that I thought was pertinent."

The Uniform Code of Military Justice requires the president of a special court-martial to exercise the judicial powers vested in his office. Other court members have no authority to replace him. It is painfully clear that here the president was merely the mouthpiece for a junior member of the court. It is reasonably inferable that the convening authority planned it that way. The net result is not only wrongful assumption of the duties of the president, but virtual reduction of the court to a one-man tribunal.

We do not attribute to the convening authority an intention to use court members who had preconceived ideas of the guilt or innocence of the accused. However, the circumstances clearly indicate that he assigned lawyers to the

**668**

court to neutralize any attempt by individual counsel to influence the court to rule in favor of the accused. This smacks of court packing.

Servicemen and women accused of crime should not be singled out for special treatment merely because they have employed civilian counsel not agreeable to the command. A member of a court can hardly be impartial if he assumes, or has been given, the mission of offsetting the efforts of an unpopular defense counsel. In this instance, the accused found themselves in an unfortunate situation. Civilian counsel represented only one accused, yet both seem to be the victims of a specially conceived strategy. Of the three lawyers selected for service on the court, the senior had testified against civilian defense counsel in a proceeding which, while not identified, was instituted to harm the defending counselor. To say the least, relations between the two were strained. A challenge for cause based on this hostility was directed against the member, who at that time was president of the court, but after a statement by him to the effect that he knew of no reason why he should be challenged, the court voted to deny the challenge. To make certain he would not serve on the court, one of the two accused exercised his peremptory challenge. Consequently, the other accused had to select between the two remaining lawyers. The second lawyer was removed, but the one who subsequently offended was beyond reach.

The conduct of the lawyer who served on the court reflects no credit on the profession. His rank did not permit him to be the president, yet he stepped out of character as a court member by usurping the function of the president, and when challenged for his activities, he was contemptuous of the one who had the temerity to question him. He belittled the efforts of defense counsel to secure an orderly trial, knowing full well that he was not following the prescribed procedure. Instead of permitting the trial to proceed along usual military judicial lines, he repeatedly influenced the rulings of the president on interlocutory questions. On the first

motion of defense counsel, the president ruled in favor of the accused, but the lawyer member objected and the ruling was reversed. While he acted within his authority on that motion, from then on he apparently controlled all rulings by making his views known before the president acted. Under the circumstances, the president had little mental freedom, for when a lawyer is made a member of a special court-martial at the last moment, other court members are likely to believe that his views must be accepted as the law.

Unless we overlook the importance of a fair and impartial trial, we cannot approve an operation which permits a court member to become an advocate for the Government. Trial counsel protects the rights of the Government. A court member cannot join the prosecution team. If a court member concludes that the president of the court has ruled erroneously on an interlocutory question, he has an appropriate method of correcting the error. But he is not a monitor who is permitted to admonish or lead the president prior to any ruling. The accused must necessarily defend against the tactics of trial counsel, but he should hardly be required to compete with any member of the court. Here, the member "joined the ranks of partisan advocates" and destroyed the accused's right to a fair trial. United States v Smith, 6 USCMA 521, 525, 20 CMR 237.

The decision of the board of review is reversed and a rehearing is ordered.

Judge LATIMER concurs.