UNITED STATES

v.

Captain Theopholieus S. WORRELL, 265–74–9249 FV, United States Air Force Hospital Robins, Warner Robins Air Logistics Center (AFLC).

ACM 22195.

U. S. Air Force Court of Military Review.

8 July 1977.

818

Appellate Counsel for the Accused: Colonel Robert W. Norris and Captain Thomas S. Markiewicz.

Appellate Counsel for the United States: Colonel Julius C. Ullerich, Jr., Major Alvin E. Schlechter and Lieutenant Colonel Abraham A. Dash, USAFR.

Before BUEHLER, Senior Judge, HERMAN and ORSER, Appellate Military Judges.

## DECISION

ORSER, Judge:

Tried by a general court-martial, the accused was convicted, despite his not guilty pleas, of one offense of aggravated assault with a revolver and one offense of carrying the weapon concealed, in violation of Articles 128 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 928, 934. The approved sentence provides for a dismissal from the service and forfeiture of all pay and allowances.

In this decision we will address three of the errors assigned by appellate defense counsel. All other assigned errors either lack merit or were considered by the staff judge advocate in his review and properly resolved adversely to the accused.

## I.

We first consider a defense claim that the conduct of a court member deprived the accused of a fair trial. Counsel specifically allege:

A MEMBER OF THE COURT–MARTIAL BECAME AN EXPERT WITNESS FOR THE PROSECUTION AND ERRO-

NEOUSLY PARTICIPATED IN THE DELIBERATIONS ON THE FINDINGS.

The charges against the accused, a medical doctor, stemmed from an incident which occurred at his duty location, the USAF Hospital, Robins Air Force Base, Georgia. The Government's evidence shows that while performing duty as the medical officer of the day (MOD) in the emergency room of the hospital, the accused became involved in a dispute with one of the hospital corpsmen concerning an entry the latter made in the medical chart of a young patient. Following angry, abusive words between the corpsman and the accused, the latter pulled a loaded revolver from his surgical garments, thrust it at the corpsman's face, and verbally threatened him.

The accused's mental responsibility was the primary trial issue. In that connection, a civilian psychiatrist testified for the defense that the accused was not responsible for the charged offenses. The witness was of the opinion that the accused experienced an acute schizophrenic episode during the incident and was unable to distinguish right from wrong. In rebuttal, the Government called as witnesses a psychologist and two psychiatrists, all of whom were active duty members of the Air Force.

The psychologist testified that the battery of tests he administered to the accused indicated no evidence of any residual type psychotic episode or schizophrenic potential. The two psychiatrists testified that at the time of the offense the accused was mentally responsible and accountable for his actions. In their opinion, the accused had a paranoid personality disorder. They viewed his conduct as an externally provoked extension of his previous paranoid pattern. They did not see the gross break from reality described by the defense psychiatrist.

The court member whose conduct is challenged served as president of the panel. In connection with questions he asked defense witnesses he indicated that he was a medical doctor with a specialty in flight surgery.[1] The appellate defense charge

---

[1]. Neither the convening orders nor the voir dire examination disclosed that the court member

was a medical doctor. However, as suggested by appellate government counsel, the member's

that the doctor member of the court gave expert testimony is premised, in part, on the following questions he posed to the defense psychiatrist:

COL SHEA: I am Doctor Shea. I'm not quite clear on your credentials. Are you a certified specialist?

A. Board eligible. I had three years psychiatric residency at the VA and Talmadge Hospital in Augusta; two years additional hospital training and now I am on the staff at the Forensic Services Center and I see private patients.

COL SHEA: You have not passed your test—

A. I have not taken the board. I am board eligible, though.

COL SHEA: There is a very crucial point here, as I see it. You mentioned, for instance, schizoid personality, paranoid personality and, of course, a psychotic break—acute psychotic break, and the very crucial point here is whether or not this was, in fact, a psychotic break. Similar behavior can occur, as you are well aware, schizoid personality, paranoid personality and what we in the military consider to be character and behavior disorders, not psychoses—not medical problems, but administrative problems, who [sic] are subject to judicial processing. That's why the very crucial point of whether or not this was a psychotic break.

Following the witness' response, the doctor member inquired: "Can I ask the court, will we have access to the competition (sic) from Eglin?" The court member obviously had reference to a psychiatric evaluation performed on the accused by Air Force medical personnel at Eglin Air Force Base, Florida. Earlier in his testimony the defense psychiatrist had indicated he had read the report of that evaluation. Though he thought the report was generally excellent, he did not believe it "went quite far enough."

specialty may have been indicated by the distinctive badge which physicians in the Air

Subsequently, the accused testified on the merits. He related a number of incidents which he indicated contributed to his state of mind out of which the charged offenses occurred. One specific matter concerned his belief that he performed an inordinate amount of extra duty as MOD compared with other doctors assigned to the hospital. At the completion of the examination by counsel, the doctor member of the court engaged the accused in the following colloquy:

COL SHEA: I'd like to clarify a couple of points on the MOD schedule, as well as EKG.

MJ: All right, that's permissible.

COL SHEA: Doctor Worrell, you and I have never met. However, I'm sure you're aware that I pull Flight Surgeon's duty.

A. Correct.

COL SHEA: And so I am on the schedule. I've noticed on the schedule and having been a hospital commander before, that for instance if there are two OB men, they're on every other night.

A. Correct.

COL SHEA: Of the week, but in addition to pulling MOD.

A. Right. I think that was primarily the only exception on the call schedule, the OB–GYN guys.

COL SHEA: What about pediatricians?

A. They were seldom ever called.

COL SHEA: Nevertheless, he was [sic] on call and had to be on telephone alert, if he's [sic] the only pediatrician, for instance?

A. Yes, but seldom ever called.

COL SHEA: But nevertheless he [sic] had to be on duty thirty days a month?

A. Yes.

COL SHEA: In addition to pulling MOD?

A. Once—twice.

COL SHEA: Surgeons pull MOD and they are on call every third night?

A. Yes, but the thing that I brought up was because these individuals selected

Force wear on their uniforms. See Air Force Manual 35–10.

their career field and because I was not able to select and to go into surgery, it seemed as if that was because I am not specialized.   .   .   .

MJ: Any other questions?  You have another question, Doctor Shea?

COL SHEA: The other one is just on the clarification of the EKG, for which you were called.   I certainly can't condone the corpsman calling you rather than the physician, unless the physician was busy on another emergency patient, so I don't condone that.  On the other hand, did you suggest to him for instance that a normal EKG is not necessarily indicative of the absence of pathology for at least twenty-four hours?  Did you suggest for instance that perhaps the blood enzyme, the white count should be taken?

A.  No, the reason being because, again, we get back to who's a doctor and who's not a doctor.   .   .   .   Later on we found out that it was a hiatal hernia, but the fact is that I felt that the respect for calling me to ask my consultation was not done person to person but corpsman to physician.

### A.

■ As a prelude to focusing on the issue of whether, by his questions, the court member became a witness, we first observe that a medical doctor is not *per se* ineligible to serve as a member of a court-martial. Article 25 of the Uniform Code, *supra*, provides, in general, that all active duty armed forces personnel are competent to participate as court members.  Neither the Code

nor any provision of the Manual for Courts-Martial carve out exceptions to the general rule of eligibility on the basis of particular job function, professional qualifications, or special expertise.  Indeed, even though the United States Court of Military Appeals has stated that the particular duty assignment of an individual may have a bearing on his competency to sit as a military juror,[2] the mere inclusion of physicians [3] and even lawyers [4] on military courts has never been condemned by the Court as inherently prejudicial to the accused.

Turning now to the member's conduct, Article 25(d)(2) of the Uniform Code provides that a witness for the prosecution is ineligible to participate as a member of a court-martial.  That prohibition is supplemented by paragraph 63 of the Manual for Courts-Martial as follows:

> If at any stage of the proceedings   .   . any member of the court is called as a witness for the prosecution, he shall, before qualifying as a witness, be excused from further duty as   .   .   .   member .   .   .   in the case.   .   .   .

■ Of course, Colonel Shea was not formally "called" as a witness, nor did he deliver sworn testimony in the customary manner.  But the absence of those factors has no significance, for it has been held that a court member is a witness for purposes of the disqualification rule when his declaration, whether on oral examination or affidavit, is received as evidence for any purpose. *United States v. Moore*, 4 U.S.C.M.A. 675, 16 C.M.R. 249, 252 (1954);  *United States v.*

2.  *United States v. Hedges*, 11 U.S.C.M.A. 642, 29 C.M.R. 458 (1960).  In *Hedges*, the Court held improper the selection of a nine member court-martial panel in which five to seven of the members had military assignments that involved law enforcement or inquisitorial functions.

3.  *United States v. Henderson*, 11 U.S.C.M.A. 556, 29 C.M.R. 372 (1960).  Although in *Henderson* the principal matter in dispute was the accused's mental responsibility, the Court indicated no concern for the fact that one of the court members happened to be a medical doctor.  As in the instant case, the real issue was whether by utilization of his medical expertise the doctor became a witness for the prosecu-

tion.  The doctor member assisted the law officer by supplying him with appropriate medical terminology to identify for the record a portion of anatomy referred to by a witness.  The Court (with Judge Ferguson dissenting) did not find the doctor's participation disqualifying.

4.  *United States v. Sears*, 6 U.S.C.M.A. 661, 20 C.M.R. 377 (1956).  Although the Court in *Sears* found no inherent prejudice in the presence of a lawyer on the court panel, it nevertheless saw a great danger that such an individual could by his conduct become a "professional juror."   See also *United States v. Glaze*, 3 U.S.C.M.A. 168, 11 C.M.R. 168 (1953).

*Mansell*, 8 U.S.C.M.A. 153, 23 C.M.R. 377 (1957); *United States v. McBride*, 6 U.S.C.M.A. 430, 20 C.M.R. 146 (1955). Thus, the question is whether in consequence of the substance of his questions court member Shea became, in fact, a witness for the prosecution. Upon careful evaluation, we hold he did not.

The Army Board of Review case of *United States v. Ivey*, 37 C.M.R. 626 (A.B.R.1967), is one of the few reported decisions which addresses the present issue in the context of personal conduct of the member during trial as opposed to prior disqualifying participation.[5] In *Ivey*, a homicide case, the crucial defense position was that the Luger type pistol involved must have been loaded by the victim without the accused's knowledge, and that the accused could not determine that factor from a visual inspection of the weapon. A court member disclosed he was a gun expert and at the invitation of the law officer demonstrated how the fact that the ammunition clip in the weapon had been loaded could have been determined by visual inspection. During his closing argument on findings, the trial counsel capitalized on the demonstration and theory expressed by the court member. The Court reversed the accused's conviction, holding that the member's performance rendered him a witness for the prosecution whose testimony devastated the defense position.

▇ In the case at hand, in marked contrast with *Ivey*, there was no demonstration of expertise in areas critical to the defense in the court member's questions to either the defense psychiatrist or to the accused. To be sure, Colonel Shea's lengthy question to the psychiatrist was directed to the core of the defense and demonstrated that he possessed more than average knowledge concerning psychiatry. However, in our opinion, the question did not amount to evidence which struck at that core. See

*United States v. Henderson, supra.* It admittedly related the witness' testimony to the court member's understanding of Air Force policy respecting individuals with personality disorders. However, at the same time, it presented no material evidence to the members of the court. Actually, the question is meaningful only when considered in the context of the evidence already before the court.

In his earlier testimony, the defense psychiatrist had described and defined schizoid and paranoid personality disorders. He had testified that prior to the accused's break with reality, pressures of his job and other factors had been responsible for the onset of a paranoid personality. He had also related that on the date of the incident the accused's paranoid personality developed into an acute schizophrenic episode, in the throes of which he was not mentally responsible for his conduct. In that setting, the challenged question strikes us as calculated to do no more than graphically convey the doctor member's desire for the witness to clarify his medical opinion of the accused's mental condition at the time of the offenses. As aptly pointed out by appellate government counsel, the court member voiced no dissatisfaction or disagreement with the witness' response to his question. Under the circumstances, we are satisfied that Doctor Shea's question did not result in his becoming a witness for the prosecution.

In his questions to the accused, Colonel Shea, not surprisingly, relied upon his personal background as a medical officer to clarify the accused's earlier testimonial assertion that he was required to perform an inordinate amount of MOD duty. As we view them, the questions did not seek to refute or challenge the accused's declaration that he performed more than his share of MOD duty. Instead, they sought the accused's acknowledgement that by virtue

---

5. To our knowledge, *United States v. Henderson, supra* (footnote 3), is the only case decided by the Court of Military Appeals where the issue involves the member's conduct during trial. The majority of the reported cases concern prior participation by the judge or court member on the basis of their signatures ap-

pearing on prosecution exhibits. See *United States v. Wilson*, 7 U.S.C.M.A. 656, 23 C.M.R. 120 (1957); *United States v. Beer*, 6 U.S.C.M.A. 180, 19 C.M.R. 306 (1955); *United States v. McBride* and *United States v. Moore*, both supra.

of their specialties certain doctors were required to be "on call," (available for duty) on a recurring basis in addition to their scheduled MOD duty. Although Doctor Shea's questions undeniably imparted information to the court concerning the duty scheduling of medical specialists in USAF hospitals, such information was extraneous in the sense that it was not relevant to the crucial issue of the accused's mental responsibility or the interrelated matter of *perceived* injustices he recited from the witness stand. Understandably, the trial counsel made no effort in his closing argument to capitalize on the matters contained in the court member's questions, or in the responses he had elicited from the accused and the defense psychiatrist.

## B.

■ Even if we were to assume, *arguendo*, that Colonel Shea became a witness for the prosecution, the question remaining would be whether the defense waived the member's disqualification. The prohibition contained in Article 25(d)(2), Code, *supra*, is not, at least in this instance, jurisdictional in nature and thus is capable of being waived. *United States v. Law,* 10 U.S.C.M.A. 573, 28 C.M.R. 139 (1959); *United States v. Hurt,* 8 U.S.C.M.A. 224, 24 C.M.R. 34 (1957); *United States v. Beer,* 6 U.S.C.M.A. 180, 19 C.M.R. 306 (1955).

As appellate defense counsel contend, in situations involving any of the statutory grounds for disqualification, silent acquiescence alone has been held insufficient to effect a waiver. To be effective, the defense conduct must constitute "an intelligent and conscious waiver of any right to question the member's eligibility to participate." *United States v. Beer, supra,* at page 184; *United States v. Hurt, supra.* We may add to that the obvious additional qualification that a waiver will not be imposed upon a mere showing of a failure to object where to do so would result in a miscarriage of justice. *United States v. Ivey, supra.*

Here, just as in *United States v. Henderson,* 11 U.S.C.M.A. 556, 29 C.M.R. 372 (1960), the court member's statements were relatively innocuous as far as the crucial issues were concerned. Furthermore, the alleged testimony by the member was given in open court in the presence of the defense and yet no objection was made to any of his utterances. And, the defense counsel neither challenged the member nor asked the military judge for a mistrial, options which counsel had a right to exercise at any stage of the proceedings. See *United States v. Masemer,* 41 C.M.R. 860 (A.F.C.M.R. 1969), *aff'd on other grounds,* 19 U.S.C.M.A. 366, 41 C.M.R. 366 (1970). In answer to the defense assertion that to have done any of the foregoing might have served no other purpose than that of antagonizing the doctor member or the remaining court members against the accused, suffice it to note that any or all such initiative could have been accomplished anonymously in an Article 39(a) session [6] out of the hearing of the court members.

■ This combination of circumstances, in our view, adds up to more than mere silent acquiescence in the presence of a court member who, by questioning witnesses during trial, allegedly became a witness for the prosecution. To paraphrase the Court in *Henderson,* we see no possibility of harm to the accused nor standing to complain on appeal.

## C.

The nature of Doctor Shea's questions to the accused necessitates that we briefly address a remaining corollary issue of whether the court member became a partisan advocate for the Government. See *United States v. White,* 14 U.S.C.M.A. 610, 34 C.M.R. 390 (1964); *United States v. Marshall,* 12 U.S.C.M.A. 117, 30 C.M.R. 117 (1961); *United States v. Flagg,* 11 U.S.C.M.A. 636, 29 C.M.R. 452 (1960). As stated by the Court of Military Appeals in *United States v. Domenech,* 18 U.S.C.M.A. 314, 40 C.M.R. 26, 30 (1969):

---

**6.** Article 39(a), Code, *supra.*

We have many times held that court members are entitled to examine the witnesses before them, including the accused, but, in so acting, they must not depart from their role as impartial arbiters of guilt or innocence and become partisan advocates for either side. See *United States v. Pratt*, 15 U.S.C.M.A. 558, 36 C.M.R. 56, and cases cited at page 562. The touchstone in determining whether court members have exceeded fair bounds in questioning witnesses is not the extent of the inquiry but "whether the triers of fact were willing to accord fair consideration to all the evidence." *United States v. Kemp*, 13 U.S.C.M.A. 89, 92, 32 C.M.R. 89. See also *United States v. Erb*, 12 U.S.C.M.A. 524, 31 C.M.R. 110.

Having carefully examined the questions asked by Colonel Shea and the responses by the accused, we find no partisan advocacy. We discern not the slightest propensity by the court member to convict regardless of the evidence. *United States v. Kemp, supra*; see *United States v. Clower*, 23 U.S.C.M.A. 15, 48 C.M.R. 307 (1974). As indicated, most of the questions seem designed to clarify the medical officer duty schedules previously mentioned by the accused. And as noted by appellate government counsel, the final quoted question indicates Doctor Shea's agreement with the accused concerning alleged unprofessional conduct of a corpsman respecting an EKG test. Whether considered collectively or individually, the court member's questions evince no impression of partiality against the accused. See *United States v. Domenech, supra*.

II.

In the second issue we address, appellate defense counsel entitle their claim as error by the military judge in permitting the accused's civilian defense counsel to argue for a dismissal as the appropriate punishment for the accused. As we analyze it, a more appropriate title to counsel's conten-

tion is that the defense counsel's argument deprived the accused of effective assistance of counsel. See *United States v. Cook*, 18 U.S.C.M.A. 159, 39 C.M.R. 159 (1969); *United States v. Garcia*, 18 U.S.C.M.A. 75, 39 C.M.R. 75 (1968). Having carefully scrutinized the record, we find no merit in the assertion.

The post-finding mitigation evidence presented by the defense consisted entirely of the testimony of two of the psychiatrists who had earlier testified for the Government on the merits. They testified, in essence, that confinement would be detrimental to the accused's mental health and that his prognosis for eventual favorable adjustment in the structured environment of military service was poor. In his sentence argument, the civilian attorney for the accused expressly concurred with the trial counsel's preceding plea that a dismissal from the service was the appropriate sentence to be adjudged.

The defense attorney stressed that confinement was not appropriate as it would only aggravate the accused's mental problems. He added that with no confinement the accused, provided he retained his medical license, could promptly become a significant asset to the civilian community. On the other hand, he said, confinement would diminish the accused's ability to retain his license and, in any event, disrupt his psyche to the point that he might not have the ability to practice medicine even if he did not lose his license.

As noted by appellate defense counsel, although prior to trial the accused submitted a request for an administrative discharge in lieu of court-martial [7] (with the express understanding that he would ordinarily receive a discharge under other than honorable conditions), at no point during the trial did he voice a personal desire that the court adjudge a punitive discharge and for his counsel to argue for that punishment.[8] *United States v. Richardson*, 18

---

7. See Air Force Manual 36–12, paragraph 20c, 28 June 1973 (as amended).

8. Unfortunately, neither the defense nor the military judge heeded the language of Air Force Manual 111–1, paragraph 4–32, 2 July 1973,

U.S.C.M.A. 52, 39 C.M.R. 52 (1968); cf. *United States v. Weatherford, supra; United States v. Blunk,* 17 U.S.C.M.A. 158, 37 C.M.R. 422 (1967). In fact, the initial indication of the accused's personal desire appears in the post-trial clemency interview. During the interview, according to the evaluator:

> The accused frankly stated that he did not want to be dismissed from the service because a dismissal implies that he served his country less than honorably. He does not believe that to be correct. The accused believes that he has served honorably and that he should not be punished with a dismissal. The accused is aware of the onerous effects of a dismissal and would like to avoid them.

Notwithstanding the foregoing, the accused's civilian counsel, in a written response to the clemency evaluation, indicated that it was the accused's personal desire that he argue for the dismissal adjudged by the court-martial. The clear implication of the attorney's language is that his argument for that exclusive punishment was, under the circumstances of the case, intended as a plea for leniency.

Neither appellate defense counsel nor the accused have disavowed the statement of his trial defense attorney. We are aware that a divided panel of the Army Court of Military Review found it inappropriate to resolve against the accused an issue touching on the adequacy of representation by counsel on the basis of his trial attorney's *ex parte* certificate. *United States v. Carter,* 43 C.M.R. 798 (A.C.M.R. 1971). However, in that case the accused during an unsworn statement to the court asserted that he desired an honorable discharge. Furthermore, he was not interviewed with a view toward clemency after the trial.

■ In the case at hand, the accused neither testified under oath nor made an unsworn statement during the trial. His statement to the clemency evaluator that he did not desire or deserve the adjudged dismissal is certainly understandable. However, it is not without significance that such statement was made at a time when he no longer faced the real and immediate prospect of confinement. We believe, with the dissenting Judge in *Carter, supra,* that in response to an attack on the competency of counsel, a statement by the accused's defense attorney which asserts his authorization for his trial argument on behalf of the accused may be considered by an appellate court tasked with resolution of the issue. See *United States v. Blunk, supra.*

In *United States v. Weatherford, supra* (at page 28), the Court of Military Appeals indicated that in an unusual and special case defense counsel can, at the express direction of the accused, "attempt to persuade the court-martial to impose no other punishment than a discharge." Such an argument is sanctioned when the record is convincing that it constitutes a plea for leniency and is in the accused's best interest. *United States v. Richard,* 21 U.S.C.M.A. 227, 44 C.M.R. 281 (1972); *United States v. Drake,* 21 U.S.C.M.A. 226, 44 C.M.R. 280 (1972).

In light of the serious nature of the instant charges, conviction of which authorized a maximum confinement of four years, there was a real possibility that the sentence would include some period of confine-

---

which urges counsel to disclose to the military judge in a post-finding Article 39(a) session that his client intends to ask the court for a punitive discharge. Obviously, the same policy would apply when, as here, the counsel plans to ask for the discharge on the accused's behalf. Observance of this policy would, of course, have avoided the issue we now must resolve, for during the recommended 39(a) session the military judge is encouraged to ascertain directly from the lips of the accused whether the request is to be made of his own volition and with full knowledge of the conse-

quences. The session also provides the defense counsel the opportunity to inform the military judge whether he intends to assist the accused with his request for discharge. The military judge is thus provided the necessary opportunity to determine under the guidelines expressed in *United States v. Weatherford,* 19 U.S.C.M.A. 424, 42 C.M.R. 26 (1970); *United States v. Schwartz,* 19 U.S.C.M.A. 431, 42 C.M.R. 33 (1970); and *United States v. Freeland,* 19 U.S.C.M.A. 455, 42 C.M.R. 57 (1970), whether to permit counsel's assistance.

ment. The singular thrust of the defense post-finding effort was to avoid such a consequence. Of course, in addition to telling the court members that confinement would aggravate the accused's mental disorder, the psychiatric evidence was that he was a poor candidate for rehabilitation. Of further pertinence to the latter circumstance, during the post-trial clemency evaluation the accused informed the interviewer that even though he would not welcome the stigma of a dismissal, he did not desire retention in the Air Force for rehabilitation or for any other purpose.

On the basis of the foregoing circumstances, the accused's statement to the clemency evaluator that he did not want the adjudged dismissal does not challenge, much less refute, the direct assertion in his trial attorney's response to the evaluation that his argument for that punishment was made at the accused's request. We are accordingly convinced that the defense argument constituted a plea for leniency and was in the best interest of the accused. *United States v. Richard* and *United States v. Drake*, both *supra*. Of equal significance, we are satisfied that the argument, which was made in the presence of the accused, comported with his personal desire. See *United States v. Cambridge*, 3 U.S.C. M.A. 377, 12 C.M.R. 133 (1953).

### III.

In the final assertion of error we consider, appellate defense counsel contend that since no confinement was adjudged the convening authority erred in directing application of the approved forfeiture of all pay and allowances becoming due on and after the date of his action. We agree. Article 57, Code, *supra*; Manual for Courts-Martial, 1969 (Rev.), paragraph 88d(3); *United States v. Madison*, 14 U.S.C. M.A. 655, 34 C.M.R. 435 (1964). Further in that connection, the forfeiture of all pay and allowances in the absence of confinement is contrary to the policy expressed in paragraph 88*b* of the Manual for Courts-Martial. We will take necessary corrective action as to both matters.

For the reasons stated, the findings of guilty and only so much of the sentence as provides for a dismissal from the service and forfeiture of $842.00 of one month's pay are affirmed. The application of the forfeiture is deferred until the date of promulgation of the final order directing execution of the sentence.

BUEHLER, Chief Judge, and HERMAN, Judge, concur.